Paul J. **CARDAROPOLI** et al.,
Petitioners-Appellees,

v.

John J. **NORTON**, Warden, Federal Correctional Institution, Danbury, Connecticut, et al., Respondents-Appellants.

Nos. 29–35, Docket 75–2005, 75–2015, 75–7023–75–7026, 75–2033.

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1975.

Decided Sept. 29, 1975.

Pierce O'Donnell, Washington, D. C. (Dennis E. Curtis, Stephen Wizner, Michael J. Churgin, New Haven, Conn., on the brief), for petitioners-appellees.

Thaddeus B. Hodgdon, Atty., Dept. of Justice, Washington, D. C. (John C. Keeney, Acting Asst. Atty. Gen., Edward S. Christenbury, Atty., Dept. of Justice, Peter C. Dorsey, U. S. Atty., and Thomas

F. Maxwell, Asst. U. S. Atty., on the brief), for respondents-appellants.

Before KAUFMAN, Chief Judge, and LUMBARD and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

While lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, it is today clear that an iron curtain is not drawn between the prisons of this country and the Constitution. *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Hearings of varying degrees of formality have been required in cases involving revocation of parole, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), revocation of probation, *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), certain prison disciplinary proceedings, *see, e. g., Wolff v. McDonnell, supra,* and the involuntary transfer of a prisoner to an institution for the criminally insane. *United States ex rel. Schuster v. Herold,* 410 F.2d 1071 (2d Cir.), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969). We are now called upon to decide whether similar procedural safeguards must be extended to federal prisoners prior to their classification as "Special Offenders" or "Special Cases".

## I.

A brief overview of the facts relevant to this appeal will place the issues raised in their proper context. Paul Cardaropoli entered the Federal Correctional Institution ("F.C.I.") in Danbury, Connecticut on June 8, 1973, to serve a five-year sentence for conspiracy to distribute, and distribution of, about one gram of cocaine. He discovered by chance three months later that his institutional files

had been labelled "Special Offender"[1] on the basis of information contained in a "Report on Convicted Prisoner by United States Attorney."[2] The Report alleged that Cardaropoli had

(1) Associated with several well known organized crime figures in Western Massachusetts, (2) Owned and operated the Hideaway Lounge in Springfield, Massachusetts, a known center for prostitution and drug-related offenses, (3) was present at the so-called "Little Appalachia" meeting in Worcester, Massachusetts, which was attended by every known organized crime figure from Massachusetts and Rhode Island.

Cardaropoli received no prior notice of the classification, nor was he accorded any opportunity to contest its factual basis. Requests in December, 1973, and July, 1974, for Administrative Remedy seeking removal of the label from his file and record proved of no avail.

Cardaropoli first became eligible for furlough in June, 1974. F.C.I. Danbury Policy Statement (Feb. 27, 1974); Bureau of Prisons Policy Statements 7300.-12B (January 7, 1974), 7300.12C (July 23, 1974). But his furlough request was rejected by his institutional counselling team, and his administrative appeal to the warden met the same fate. No specific reasons for the denial were revealed. In a subsequent appeal to the Director of the Bureau of Prisons from the decision denying furlough, Cardaropoli contended that the request had been rejected because of his Special Offender designation, and denied any association with organized crime. The Assistant Director of the Bureau gave short shrift to Cardaropoli's claims. He noted that, according to Justice Department records, Cardaropoli was "a known associate of persons connected with organized crimi-

---

1. This term, currently employed by the Bureau of Prisons, is used interchangeably with "Special Case". It is applied to "certain special categories of offenders who require greater case management supervision than the usual case." Bureau of Prisons Policy Statement 7900.47 (April 30, 1974).

2. Form 792, "Report on Convicted Prisoner by United States Attorney", submitted by Paul Coffey, Strike Force Attorney, Hartford, Connecticut. These completed forms are distributed to the Board of Parole and to the institution at which sentence is to be served.

nal activity," and that he had attended a meeting of such persons in Worcester, Massachusetts.

> Consequently, we find the special offender designation is not inappropriate. Except in unusual circumstances, which we do not see here, social furloughs are not ordinarily granted to persons significantly associated with organized criminal activity.[3]

Cardaropoli filed a petition for habeas corpus on March 18, 1974, challenging his classification as Special Offender. On October 17, 1974, the District Court for the District of Connecticut, Robert C. Zampano, *Judge*, ordered the designation removed from Cardaropoli's records and files, and enjoined reclassification in the absence of the procedural protections mandated for the Special Offender program in his decision in *Catalano v. United States*, 383 F.Supp. 346 (D.Conn.1974) announced eight days earlier. Although the Government here appeals from the orders filed in *Cardaropoli* and six similar cases,[4] it elected not to appeal the decision from which they were spawned. Nonetheless, we must decide this appeal in the light of the extensive findings of fact concerning the nature and effect of the Special Offender classification, and the safeguards to be afforded,[5] set forth in Judge Zampano's reasoned opinion in *Catalano*.

## II.

To frame Judge Zampano's ruling, a brief description of the prior procedures for classifying Special Offenders, and the grave consequences of this designation, is in order. The Bureau of Prisons, during the pendency of the *Catalano* case, promulgated a series of standards "to identify and tabulate information on certain special categories of offenders who require greater case management supervision than the usual case." United States Bureau of Prisons Policy Statement 7900.47 (April 30, 1974). These new[6] guidelines set forth eight broad categories meriting Special Offender designation: non-federal prisoners, members of organized crime, protection cases, extreme custody risks, subversives, notorious individuals, persons who have threatened high government officials, and any other offender who requires "especially close supervision."

The modus operandi is that the warden of each prison assigns a staff member to coordinate the Special Offender program. Institution staff members base their initial determination on court records, information from the Central Office of the Bureau of Prisons, "or other reliable sources."[7] Affirmative recommendations to impose Special Offender status are reviewed by the Central Office in Washington, D. C., and, if con-

---

3. Section 5(c)(2) of Bureau of Prisons Policy Statement 7300.12C (July 23, 1974), provides: "Ordinarily, furloughs will not be granted for persons identified with large scale criminal activity. . . ."

4. Cardaropoli's petition has been consolidated for purposes of this appeal with those of Joseph Maida, Maurice Barsky, Louis Piselli, William Silverman, Howard Silverman, and Nicholas Lasora. Each is an inmate at Danbury F.C.I. who successfully challenged his Special Offender designation before Judge Zampano.

5. The procedures mandated include notice to the inmate, opportunity for a personal appearance before an impartial decision-maker and the presentation of evidence, a written statement of reasons for the designation, and others. *See infra.* The findings of fact are based

in large part upon the testimony of eight witnesses at hearings held over a three-day period. *Catalano v. United States*, 383 F.Supp. 346, 347 n. 3 (D.Conn.1974).

6. As Judge Zampano noted,

> Prior to the issuance of these criteria, there were no written rules, regulations, instructions, or policy statements to aid the decision-maker faced with a potential "Special Case" . . . [D]ecisions were based on vague, indefinite and varying sets of guidelines.

*Catalano v. United States, supra*, 383 F.Supp. at 349.

7. Bureau of Prisons Policy Statement 7900.47 (April 30, 1974).

firmed, prevent the transfer of such inmates or their participation in community programs without prior approval by the Central Office. A stamped notation of these restrictions is recorded on the prisoner's file at the institution. Bureau of Prisons Policy Statement 7900.47, paragraph 6 (April 30, 1974).

Neither these procedures nor those previously in effect afford a prisoner formal notice that he is a possible subject for Special Offender designation, nor do they inform him that the label has been recommended or approved. Moreover, the inmate is not apprised of the factual foundation for the classification and, though his administrative remedies are preserved, Bureau of Prisons Policy Statements 2001.6 (February 14, 1974), 2001.6A (October 18, 1974), "at best these provide merely a review 'on the records.'" *Catalano v. United States, supra,* 383 F.Supp. at 349.

Perhaps the most significant of Judge Zampano's findings in *Catalano* is his conclusion that

> The consequences of a "Special Offender" classification are significant. In most cases, the designation delays or precludes social furloughs, release to half-way houses and transfers to other correctional institutions; in some cases, the characterization may bar early parole.

383 F.Supp. at 350. The Special Offender's request for temporary leave or transfer is subjected to the additional requirement of securing approval by the Central Office of the Bureau of Prisons. "Inordinate delays are common." *Id.*

Moreover, approval of applications for leave or transfer at the institutional level may often be summarily overruled by the Central Office, "solely on the ground that the petitioners were 'Special Offenders.'" *Id.*[8]

The classification also has significant consequences for an inmate's parole application. The Regional Director of the Board of Parole may designate as within the "original jurisdiction" of the Regional Directors the application of a Special Offender whose label is based upon participation in organized crime. 28 C.F.R. § 2.17(a), (b)(2) (1974). All original jurisdiction cases are eventually submitted for *en banc* consideration of the five Regional Directors. 28 C.F.R. § 2.17(a) (1974).[9]

The Board of Parole does review the underlying evidence relied upon by the Bureau of Prisons in designating an inmate a Special Offender.[10] If the classification is found to have some basis in fact, "his parole release may well be affected, even to the point of exceeding the appropriate length of time prescribed" by the United States Board of Parole Table of Guidelines, 28 C.F.R. § 2.20 (1974). *Catalano v. United States, supra,* 383 F.Supp. at 350.

### III.

■ We agree with Judge Zampano's finding that social furloughs, work release, transfer to Community Treatment Centers, and the opportunity for early parole are

> cognizable benefits extended to all prisoners at the F.C.I. These ameni-

---

**8.** As indicated in note 3, *supra*, Special Offenders identified with large scale criminal activity will ordinarily not be granted furloughs, even if otherwise eligible. Since their Special Offender status was expunged pursuant to the lower court's order, each of the petitioners before us has been granted one or more furloughs.

See also Bureau of Prisons Policy Statement 7300.13D: "Generally, individuals who have been convicted of . . . an organized, sophisticated offense, have little need for CTC [Community Treatment Center] programs . . . [and] are to be referred to the Central Office for approval." Ingoglia, one of the

petitioners in *Catalano*, received institution staff approval for transfer to a CTC which was later overturned by the Central Office pursuant to this procedure. 383 F.Supp. at 348.

**9.** On April 8, 1974, Cardaropoli was notified of the *en banc* decision of the Regional Directors to continue his sentence to expiration, with a review on the record in December, 1974.

**10.** 28 C.F.R. § 2.21 (1974). The inmate, however, has little opportunity at this juncture to contest the accuracy of such evidence meaningfully.

ties are eagerly solicited and received by the inmates and obviously play a meaningful role in enhancing rehabilitation, reducing frustration, maintaining morale, and minimizing unrest in the prison setting.

*Catalano v. United States, supra,* 383 F.Supp. at 351. The Special Offender classification works serious alteration in the inmate's conditions of confinement because it hinders or precludes eligibility for these important rehabilitative programs.[11] We therefore conclude that the marked changes in the inmate's status which accompany the designation create a "grievous loss", *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. 2593; *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, *J.,* concurring), and may not be imposed in the absence of basic elements of rudimentary due process.[12]

## IV.

■ Having determined that due process applies in the circumstances here presented, the question remains what process is due. *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. 2593. It is now axiomatic that the requisites of procedural due process vary according to the factual contexts of the particular case. *Id.; Goldberg v. Kelly, supra,* 397 U.S. at 262–63, 90 S.Ct. 1011; *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

The inmate's interest in insuring the accuracy of a proposed Special Offender classification must be balanced against the governmental interest in the orderly administration of the prison system.[13]

---

**11.** The Government contends that when initially confined and classified, an inmate has "no legitimate claim of entitlement" to any classification or its absence, or to any conditions of confinement related to any classification. Brief at 15. "Only subsequent to the classification, after the inmate has been enjoying the benefits allowed within that classification, can he have a legitimate claim of entitlement to those benefits. . . ." *Id.* This argument, to the extent it attempts to resurrect the now-discredited right-privilege dichotomy as an analytical approach to due process, must fail. *See, e. g., Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Sostre v. McGinnis,* 442 F.2d 178, 196 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). *See also* Van Alstyne, The Demise of the Right-Privilege Dichotomy in Constitutional Law, 81 Harv.L.Rev. 1439 (1968).

The serious adverse consequences which flow from the Special Offender designation are found, most significantly, in the total or partial loss of *eligibility* for substantial benefits normally afforded every inmate. Preclusion from access to those benefits entails loss as grievous as that occasioned by their revocation, for the inmate's stake remains the same in each instance. Moreover, unlike other classifications of newly-admitted inmates (e. g., as maximum, medium, or minimum security risks), the Special Offender label cannot be mitigated or removed by reason of the inmate's subsequent behavior, even if it is exemplary.

Finally, the Government urges that any "loss" which may be felt results not from the designation, but from the facts which underlie it. Putting the question begged to one side, this contention merely reinforces the need to insure that those underlying facts be determined with scrupulous accuracy, discussed *infra. See Gagnon v. Scarpelli,* 411 U.S. 778, 785, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

**12.** We are not unmindful of "[t]he tendency of a principle to expand itself to the limit of its logic", B. Cardozo, The Nature of the Judicial Process 51 (1921); Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1300–01 (1975). It must be emphasized that the changes in conditions of imprisonment at issue here are of a most serious and substantial nature. We do not suggest, therefore, that the procedures required by today's decision must also be observed before a prisoner is subjected to some *minor* deprivation, "such as an evening's loss of television privileges." *Wolff v. McDonnell, supra,* 418 U.S. at 594, 94 S.Ct. at 2993 (Douglas, *J.,* dissenting).

**13.** Judge Zampano found that the designation "provides an expedient and effective method to call attention to an inmate who might pose a danger to others if transferred, temporarily released, or paroled," a conclusion not in issue here. *Catalano v. United States, supra,* 383 F.Supp. at 351–52. *See generally,* Warren,

Judge Friendly has elaborated on the balancing approach in which the court should engage:

> The required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it.

Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1278 (1975); *Frost v. Weinberger*, 515 F.2d 57, 66 (2d Cir. 1975). *See also Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); *United States ex rel. Bey v. Connecticut*, 443 F.2d 1079, 1086 (2d Cir.), *vacated as moot*, 404 U.S. 879, 92 S.Ct. 196, 30 L.Ed.2d 159 (1971); *Sostre v. McGinnis*, 442 F.2d 178, 196 (2d Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

The Supreme Court recently reminded us that "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell, supra*, 418 U.S. at 558, 94 S.Ct. at 2976. In our view, the minimal procedural safeguards mandated below provide a fair and feasible basis by which the arbitrary imposition of the Special Offender classification may be prevented.

■ In *Catalano v. United States, supra*, 383 F.Supp. at 352–53, and in his order in the case before us, Judge Zampano chose a middle ground between the different components of due process urged by petitioners and the Government. At least ten days notice[14] is to be given the inmate when a Special Offender classification is contemplated. The notice must specify the reason or reasons for the proposed designation, and provide a brief description of the evidence to be relied upon. The inmate is to be afforded a personal appearance before a disinterested decision-maker.[15] At the hearing, the prisoner must be permitted to call witnesses and present documentary evidence; however, the hearing officer retains discretion "to keep the hearing within reasonable limits . . . ." *Wolff v. McDonnell, supra*, 418 U.S. at 566, 94 S.Ct. at 2980. In addition, the inmate is to be fully informed at that time of the evidence against him and afforded a reasonable time to present his side of the case.

■ There is no requirement that the classification proceedings be transcribed or recorded. Moreover, confrontation with and cross-examination of those furnishing information against the inmate are not required "[e]xcept in the unusual situation where the decision-maker cannot rationally determine the facts." *Catalano v. United States, supra*, 383 F.Supp. at 353. While counsel need not be *furnished*, if the issues are complex or the inmate appears unable to collect or present his evidence, he is *permitted* the aid of retained counsel, or counsel-substitute.

Judge Zampano's order further provided that the hearing officer, appointed by the warden or the Bureau of Prisons, may not have personal knowledge of the information upon which the proposed Special Offender classification is based. And if the hearing officer determines that the classification is warranted, he

---

"Classification of Offenders as an Aid to Efficient Management and Effective Treatment" in President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections (1967); American Correctional Association, Manual of Correctional Standards 351, 365 (3d ed. 1966). We are called upon in this appeal, however, to determine neither the wisdom nor utility of the Special Offender program, but rather what procedural predicates to its operation the Constitution requires.

14. The notice given should be written. *Cf. Morrissey v. Brewer, supra*, 408 U.S. at 489, 92 S.Ct. 2593; *Wolff v. McDonnell, supra*, 418 U.S. at 564, 94 S.Ct. 2963.

15. For a general discussion of the need for impartiality in a related context, *see* Harvard Center for Criminal Justice, Judicial Intervention in Prison Discipline, 63 J.Crim.L. 200, 210 (1972).

must support that decision with written findings, submitted within a reasonable time after the hearing. Finally, it is mandated that a recommendation that Special Offender status be conferred upon an inmate be reviewed by the Chief of Classifications and Parole at the institution, the Warden, and ultimately, the Bureau of Prisons. *Id.* at 353.[16]

■ These minimum[17] requirements of due process find their roots in recent Supreme Court decisions treating the different degrees of procedural due process to be afforded in parole revocation, "good time" credit revocation, and other prison proceedings. *See, e. g., Morrissey v. Brewer, supra,* 408 U.S. at 489, 92 S.Ct. 2593; *Wolff v. McDonnell, supra; Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).[18] The importance of these safeguards to the fairness of the classification proceedings is both apparent and significant.

Cardaropoli's Special Offender status, for example, was grounded in part in his alleged ownership of the Hideaway Lounge. Yet the Government later conceded that he did not own the Lounge; he was merely employed there as a bartender.[19] In *Masiello v. Norton,* 364 F.Supp. 1133, 1136 (D.Conn.1973), Judge Zampano found no basis for the Board of Parole's conclusion that Masiello was a professional criminal who had played a significant role in a criminal organiza-

tion. In sum, in Judge Zampano's words,

> time and time again the government through various agencies has demonstrated to me that serious errors have been made in this field.

Transcript at 77.

■ It is urged by the Government that notice to the inmate of his classification as a Special Offender, in conjunction with the administrative remedy procedures provided by Bureau of Prisons Policy Statement 2001.6A (October 18, 1974), amply satisfies any process which may be due. We do not agree. Repeated efforts by Cardaropoli and Masiello to have their Special Offender designations removed through administrative channels proved unsuccessful, despite the factual errors noted above. Clearly the inmate's contribution to an informed and accurate fact-finding process will be more profitably utilized by the hearing officer before, and not after, the classification decision has been made.

## V.

The procedural elements here prescribed, in our view, strike a reasonable equipoise between inmate and institutional needs. The requirement of at least ten days written notice of the proposed classification provides the inmate with an opportunity to marshall the

---

**16.** These requirements have been adopted *in haec verba* by several recent lower court decisions. *See, e. g., Raia v. Arnold,* Civil No. 75–25 (M.D.Pa., July 7, 1975); *Salli v. United States,* Civil No. 75–595 (M.D.Pa., August 6, 1975); *Stassi v. Hogan,* 395 F.Supp. 141 (N.D. Ga.1975).

**17.** Nothing we have said concerning the minimum necessary procedural protections should be construed as limiting the safeguards which prison officials may provide. At the same time, however, as the Supreme Court noted in *Wolff,* as the problems of penal institutions change and correctional goals are reshaped in future years, "circumstances may then exist which will require further consideration and reflection." 418 U.S. at 568, 572, 94 S.Ct. at 2982.

**18.** Here, as in *Morrissey,* the proceeding is not to be equated in any sense to a criminal prosecution. It is a relatively narrow inquiry, and should be sufficiently flexible to consider material that might not be admissible in an adversary criminal trial. 408 U.S. at 489, 92 S.Ct. 2593.

**19.** Letter of E. O. Toft, Northeast Regional Director of the Bureau of Prisons, March 6, 1975. AUSA Mear conceded to the court below that "I personally am satisfied that Mr. Cardaropoli is not a member of organized crime." (Tr. 395). Whether Cardaropoli may properly be reclassified a Special Offender is, of course, a decision entrusted to the informed judgment of the Bureau of Prisons, to be made in conformity with the procedures outlined in this opinion.

facts in his defense. The slight delay thereby occasioned is not as significant as it might be in the context of prison disciplinary proceedings, where authorities may be confronted with an emergency requiring immediate response. *Cf. Wolff v. McDonnell, supra.* Indeed, Special Offender designations are normally made soon after the inmate enters the institution, and some time before he becomes eligible for parole, furlough, or CTC transfer.

■ Although the inmate may call witnesses and present documentary evidence, the hearing officer retains discretion "to refuse to call witnesses that may create a risk of reprisal or undermine authority . . . ." *Catalano v. United States, supra,* 383 F.Supp. at 353, quoting *Wolff v. McDonnell, supra,* 418 U.S. at 566, 94 S.Ct. 2963. *See generally* American Correctional Association, Manual of Correctional Standards 410 (3d Ed. 1966). While this discretion is not unbounded, it preserves sufficient flexibility to insure the integrity of the proceeding.

■ And the inmate's opportunity for confrontation and cross-examination, available only when the decision-maker cannot otherwise rationally determine the facts, is not without restraints. Such an opportunity, while of paramount importance in many settings, is unnecessary in the overwhelming majority of Special Offender classification proceedings where "the source of the information against the prisoner is contained in his presentence report or in other documentary materials." *Catalano v. United States, supra,* 383 F.Supp. at 353. *See also Sostre v. McGinnis,* 442 F.2d 178, 196–97 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). Although the risk of prison disruption is minimal because most witnesses confronted would not be fellow inmates, *compare Wolff v. McDonnell, supra,* 418 U.S. at 568–69, 94 S.Ct. 2963, we do not believe that the balance of interests is upset by this limitation and its exception.

The availability of counsel is more problematic, both in the classification of Special Offenders and in prison proceedings generally. *Compare Gagnon v. Scarpelli, supra,* 411 U.S. at 787–88, 93 S.Ct. 1756 *with Wolff v. McDonnell, supra,* 418 U.S. at 569–70, 94 S.Ct. 2963, "The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals." *Id.* at 570, 94 S.Ct. at 2981. Even if this result were equally inevitable in this non-disciplinary context, any danger posed is minimized by permitting counsel or counsel-substitute only in those instances in which the issues are complex or the inmate appears unable to collect or present his evidence. *See Gagnon v. Scarpelli, supra,* 411 U.S. at 790–91, 93 S.Ct. 1756.

Moreover, this Circuit recently noted that a statement of reasons by the decision-maker will permit a reviewing body to determine whether appropriate, rational, and consistent criteria have been adopted and followed. It "also protects the inmate against arbitrary and capricious decisions or actions based upon impermissible considerations." *United States ex rel. Johnson v. Chairman, N. Y. S. Board of Parole,* 500 F.2d 925, 929 (2d Cir. 1974), *vacated as moot sub nom. Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1975). A requirement that reasons be set forth in the individual prisoner's case, with at least minimal specificity, *Stassi v. Hogan,* 395 F.Supp. 141, 145 (N.D.Ga.1975), "promotes thought by the decider" and compels him "to cover the relevant points." Frankel, *Criminal Sentences* 40–41 (1973). In addition to checking abuse or error, such a statement may serve to lessen inmate resentment and help achieve significant goals of the rehabilitative system. Johnson, "Federal Parole Procedures", report submitted to the Administrative Conference of the United States, January 1, 1972, 25 Ad.L.Rev. 459, 484–85 (1973); President's Commission on Law Enforcement and the Ad-

ministration of Justice, Task Force Report: Corrections 64, 83, 86 (1967); Davis, Discretionary Justice 128, 131 (1969).

Finally, the institution's Chief of Classification and Parole, the Warden, and the Bureau of Prisons will be aided in their review of affirmative recommendations of Special Offender status if they are aware of the reasons for the action taken. Inasmuch as the Chief of Classification and Bureau of Prisons reviewed such designations as a matter of course until 1974, *Catalano v. United States, supra*, 383 F.Supp. at 349, these essentials for meaningful review are clearly far from onerous.

Whatever additional burden must be borne by prison administrators as a result of the procedural safeguards here specified is insignificant. Special Offenders represent a "comparatively small proportion of the inmate population [which] presents special prison management problems, and requires special handling." Bureau of Prisons Policy Statement 7900.47 (April 30, 1974). Only 39 of 800 inmates at Danbury F.C.I. were so classified. *Catalano v. United States, supra*, 383 F.Supp. at 352. And roughly 500 of the 23,500 inmates in the federal penal system in 1974 were designated Special Offenders.[20]

Affirmed.

---

20. The number of prisoners affected by our ruling is minuscule when compared with cases in which the relief requested would be extended to all prisoners in a correctional system. *See, e.g., Menechino v. Oswald*, 430 F.2d 403, 409–10 (2d Cir. 1970), *cert. denied*, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971) (in 1967, New York State parole officials conducted more than 11,000 parole hearings). *See also Wolff v. McDonnell, supra*, 418 U.S. at 574, 94 S.Ct. 2963 (in 1973, federal prison officials conducted 19,000 misconduct hearings, 1,173 parole revocation hearings, and 2,023 probation revocation hearings).