Frank GIAMPETRUZZI et
al., Plaintiffs,

v.

Benjamin MALCOLM, Commissioner,
Department of Correction of the City
of New York, et al., Defendants.

No. 72 Civ. 4735.

United States District Court,
S. D. New York.

Nov. 24, 1975.

The Legal Aid Society, for plaintiffs; William E. Hellerstein, Marjorie M. Smith, Daniel Pochoda, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendants; Donald J. Tobias, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

This civil rights action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 by unconvicted detainees currently or formerly housed in tier 1B at the New York City House of Detention for Men (HDM), an area established by the

New York City Department of Corrections (Department) as an administrative segregation unit for persons who pose security risks to the Department's institutions.

Plaintiffs assert first that the defendants' failure to afford them the rights and privileges enjoyed by the general inmate population at HDM violates their constitutional rights in several respects, and second, that the procedure by which it is determined whether they are to be placed in 1B deprives them of due process. In particular, they seek declaratory relief and an injunction (1) requiring the defendants to provide them with all rights and privileges given persons in the general inmate population; (2) prohibiting their continued confinement in segregation without a procedurally adequate determination of their status; and (3) requiring the defendants to expunge all references in HDM's records to their classification as security risks and their placement in 1B. They also seek monetary damages and an injunction prohibiting the defendants from denying visitation rights to all inmates placed in punitive segregation.

A hearing was held on the plaintiffs' motion for a preliminary injunction which was consolidated with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The Court also heard *in camera* testimony by the defendants concerning the Department's justification for segregating certain of the plaintiffs, and, on two occasions both before and after the hearing, conducted a personal inspection of HDM generally and of 1B in particular.

For the reasons set forth below, we conclude that the conditions under which 1B inmates are detained *in* administrative segregation are substantially inferior in a significant number of ways to those enjoyed by the general population inmates and that, as a result, inmates may be housed in 1B only after they have been afforded an opportunity to contest their placement consistent with the requirements of due process. Defendants must expunge all references in its records to an inmate's placement in 1B unless his placement is determined, according to the hearing procedures set forth below, to be justified. Defendants must also extend visitation rights to detainees in punitive segregation. The claim for monetary damages is denied.

## I. *Conditions of Confinement*

Administrative segregation units exist in several of the Department's detention facilities. General Order 33, which was promulgated by the Department on December 14, 1972, is the order governing such units and provides:

"Section 4.84A Administrative segregation is a classification within a facility of the Department, the purpose of which is to keep an individual segregated from and under closer observation than individuals in the general inmate population at large."

Tier 1B is such a unit and was established in October, 1973 to provide flexibility in selecting housing for security risks. Its location was chosen in part because of its physical characteristics, some of which are subject to challenge here.

Turning first to the allegation that conditions of confinement for plaintiffs are more onerous than for other inmates at HDM, General Order 33 itself sets the standard by which the validity of the limitations are to be judged. Section 4.48C states:

"An individual in an Administrative Segregation status shall not be deprived of any right guaranteed by law, nor shall he be deprived of any privilege enjoyed by the general inmate population at large, except that the head of the institution may, in his discretion, permit these privileges at a different time and at a different place than is permitted to the general inmate population."

■ The alleged discrepancies between defendants' treatment of plaintiffs on the one hand and the general inmate population on the other are therefore measured in the first instance by wheth-

er they deprive plaintiffs of the privileges accorded to the general population. Failure by defendants to follow their own rules would, in itself, violate due process of law. *Paul v. United States,* 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Vitarelli v. Seaton,* 359 U.S. 535, 539–540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 780 (2d Cir. 1972); *King v. Higgins,* 370 F.Supp. 1023, 1028 (D.Mass.1974).

■ The treatment of plaintiffs must, of course, also meet the requirements of the First, Fourth, Sixth and Eighth Amendments and the Equal Protection Clause. In considering the constitutionality of specific conditions of confinement, however, defendants' legitimate concern for the security of HDM must be given due weight.

### A. *Physical Setting, Isolation and Lockout*

#### 1. *Physical Setting*

There are stark physical differences between tier 1B and the general population cell blocks. The general population cell blocks are several stories high with windows providing ample natural light. On the other hand, 1B is an area of HDM only one story high with screens and small windows which are so small or so dirty that it is difficult to see through them. As a result, there is a pronounced difference in the light in one area as compared with the other.

#### 2. *Lockout*

Noticeable differences also exist in the type of facilities available to 1B inmates during lockout hours as distinct from those provided to the general population. Inmates in general population have access during lockout to two day rooms on each cell block, which each measure 57 by 38 feet. (Tr. p. 38) They may also use an area on the first floor of each cell block (the "flats") 318 feet long by 11½ feet wide, equipped with tables and chairs. (Tr. p. 396) In contrast, the area available for men in 1B when they are allowed to leave their cells is restricted to an unfurnished, narrow corridor 5 feet by 6 feet. (Tr. p. 226) Although there is a day room physically located adjacent to one end of 1B, the plaintiffs are not allowed to use it because the possibility that correctional officers might have to intermingle with the inmates in order to guard them would create a security risk. (Tr. p. 287)

#### 3. *Isolation*

Plaintiffs claim that they are held in such isolation during lockout and other hours as to deprive them of the privilege, enjoyed by general population, of associating with the company of a significant number of other inmates. The evidence establishes that an inmate in the general population is able to mingle with the population of one half of a cell block at a time, or approximately 150 inmates. (Tr. p. 292) On the other hand, 1B inmates are permitted to mingle only with the inmates of 1B, or an average of about fourteen. (Tr. p. 282) Because the inmates can share the company of other inmates on their side of the tier only, this generally limits their association to approximately seven people. (Tr. pp. 412–413) Moreover, the general population eats its meals in the day rooms adjacent to its cell blocks while the plaintiffs eat their meals in their own cells.

■ The evidence compels the finding that inmates of 1B are clearly more isolated and enjoy substantially less freedom of movement than inmates in the general population, and that lockout facilities available to them are substantially inferior to those of the general population.

The defendants argue that the differences in conditions are justified on the basis of the security requirements of General Order 33 which specifies that the purpose of administrative segregation is "to keep individuals segregated from individuals in the general inmate population at large." Legitimate though that goal may be, it cannot justify the restrictions of movement and limitations placed on the plaintiffs during lockout.

The failure to house plaintiffs under the least restrictive means necessary to accomplishing the purpose of administrative segregation violates the rights guaranteed 1B inmates under the due process clause and, indeed, ignores the very standard of equality set by defendants' own General Order 33.

█ We conclude that, like other inmates, the plaintiffs are entitled to the use of a day room (presumably the day room adjacent to the 1B area) for reasonable use during the period in which they are entitled to be outside of their cells. Use of the day room is feasible from a security standpoint. Warden Thomas himself testified that if a guard walk were built around the perimeter of the room, it would be possible to use the room on a secure basis. (Tr. p. 287) If the day room cannot presently be used under secure arrangements, the defendants are obligated to find a method by which it or some other space can be made secure. Such a room must also be equipped with reasonable furnishings. A witness for the defendants admitted that the presence of table and chairs would not necessarily create a security risk. (Tr. p. 379) We assume that chairs and tables can be secured to the floor or that some other arrangements can be made to eliminate the possibility of their use as weapons. Under such circumstances, we also believe that the plaintiffs are entitled to eat their meals at tables in the day room during meal time, although the defendants may of course impose a reasonable limitation on the number of people who may use the room at one time.

B. *Recreation and Programmatic Activities*

1. *Availability of Recreational Equipment*

█ The general population is furnished quiet game material such as chess and checkers during lockout. The plaintiffs claim that they are not. Deputy Warden Caldwood testified that he authorized sending such games and equipment to 1B (Tr. p. 190) but there was no proof that this instruction had been executed.

We find that the plaintiffs are entitled to the use of such equipment as long as it is made available to other inmates. The defendants are directed to determine whether the equipment is available in 1B and, if it is not, to make it available.

2. *Movies and Special Shows*

█ Movies are shown as often to inmates in 1B as to those in the general population. The privilege differs only in that detainees in 1B view the movies on a small screen in the narrow corridor outside their cells rather than on a large screen in the company of the general population. This difference is hardly of constitutional magnitude. Nevertheless, once a day room is made available to the inmates and unless there are security considerations demonstrated hereafter, the plaintiffs should be entitled to view the movies in that day room.

Turning to the issue of special shows, the general rule is that 1B inmates may attend these shows but the authorities at HDM determine whether 1B may attend any particular show on the basis of their estimate of the degree of tension at HDM at the time. (Tr. p. 622) This is a justifiable security precaution, and the Court should not second guess the assessment of the state of institutional morale if it is made in good faith by the officials authorized to run the institution.

3. *Educational Programs*

█ No educational programs are offered to 1B inmates. The Department specifies two reasons: first, that 1B inmates must be isolated from the general population; second, that the programs are offered in relatively insecure areas of the institution.

These reasons justify a refusal to allow participation in the programs at the same time and place as other inmates but do not justify a failure to provide the programs to 1B inmates at appropriate times and places. Indeed, General

Order 33 provides that no one in administrative segregation shall be deprived of any privilege enjoyed by the general inmate population although the privileges may be granted at a different time and place from those scheduled for other inmates at HDM. Accordingly, we conclude that the defendants must provide these or reasonably similar programs to inmates in 1B but may do so in the day room to be provided and in classes comprised only of persons housed in 1B. Although art classes, basic literacy programs and other programs may be sponsored by outside volunteer groups, the defendants must use their best efforts in good faith to find volunteer teachers for such classes.

### 4. Volunteer Social Services

██. Warden Thomas saw no objection to extending volunteer social services such as Odyssey House programs and counselling by volunteer clergy to the plaintiffs as long as the people providing them did not meet with the inmates in the 1B area itself, because non-institutional personnel are not permitted by the rules at HDM to enter the tier. Warden Thomas suggested that such programs might take place in the counsel room. (Tr. p. 323)

We find that the plaintiffs are entitled to the implementation of this suggestion or a comparable alternative.

### C. Personal Property

### 1. Limitation on Number of Books in Cells

██ Plaintiffs allege that they are more restricted in the number of books they may keep in their cells than are inmates in the general population. 1B inmates may not keep more than five books at a time in their cells. While this informal rule applies to the general population, it is not regularly enforced as to them. We find the limitation as it applies to non-legal books to be reasonable.

The restriction as it applies to legal books stands in a different light. As of May 19, 1975, the New York State regulations on the subject relating to persons in correctional institutions in New York State were amended to provide in part:

"In any case where an inmate who is confined in a segregation unit owns more than five books and periodicals, the number of books and periodicals he is permitted to have in his cell at one time may be limited to not more than five books and periodicals; provided, however, that such limitation shall not apply to law books, legal periodicals or other legal material." (7 N.Y.C.R.R. Chap. VI, § 301.3(b) as amended)

As a matter of equal protection of law, the detainees in 1B are entitled to the same benefits as those afforded convicted prisoners who are subject to New York State regulations. The regulation cited above is applicable to inmates who are confined in state segregation units, and whatever security considerations may apply to inmates of 1B presumably apply to inmates similarly situated in state facilities. We therefore find that limitation on books shall not apply to law books, legal periodicals or other legal materials.

### 2. Personal Clothing

██ Inmates in 1B are required to submit a request slip before receiving clothing from visitors. However, they are not actually prevented from receiving clothing and the rule, valid in itself as a security precaution, appears to be administered on a flexible basis. We find no violation as to this requirement.

### D. Disciplinary Infractions

██ The plaintiffs contend that the punishments imposed on any of them who is found guilty of a disciplinary infraction at HDM is systematically greater than that given inmates in the general population for the same infraction.

A statistical comparison submitted by the plaintiffs between a random sample of sentences imposed on 78 inmates in the general population for disciplinary infractions and those imposed on 1B inmates supports the plaintiffs' claims that stiffer sentences have been regularly imposed or given 1B inmates than on the

general population for similar infractions. (Affidavit of Dr. Michael Smith and exhibits attached thereto)

Sentences for similar infractions may not, of course, as a matter of law be harsher in relation to 1B inmates solely because they are 1B inmates. However, the probative value of the statistical study is open to question and we decline to order the defendants to replace the officials who currently determine disciplinary matters in 1B. We do order the defendants to direct the warden to review the sentences imposed on 1B inmates to determine whether there is justification for any particular sentence if he finds it to be above the norm and to reduce it to the norm if he finds that there is no such justification.

E. *Religious Services*

Detainees in 1B are not permitted to attend the communal religious services open to the general population. The reason offered by Warden Thomas is understandable: to allow 1B inmates to congregate with HDM's general population at regularly scheduled times such as weekly religious services would seriously increase the risk of escape or of a significant disturbance. (Tr. pp. 316–17) In contrast to the religious services, the special shows given at HDM are not regularly scheduled at the same time and place each week and allowing 1B inmates to attend those shows consequently does not create the same risk that permitting them to attend religious services would.

Under present circumstances, 1B inmates do conduct services during lockout hours in the narrow corridor outside their cells. The area is not only very small, but contains no furnishings or religious equipment and the services are often conducted at a time when they compete with the use of television and radio by other 1B inmates. While Muslim services usually occur weekly, the testimony whether 1B inmates were guaranteed the right to conduct weekly services was ambiguous. Deputy Warden Brown testified that the inmates probably needed permission each week because there was no written order on the subject. (Tr. pp. 620–21) Presumably, regular requests have to be made to conduct services. Deputy Warden Brown also testified that the administration would permit ministers to visit inmates on the 1B tier but that he was unaware whether any ministers had ever actually done so.

The plaintiffs claim that depriving them of the opportunity to worship with the general population violates their rights under the First Amendment. The First Amendment rights of a detainee may be limited only to the extent necessary to ensure his appearance at trial and to assure the security of the institution. *Rhem v. Malcolm,* 507 F.2d 333, 336–37 (2d Cir. 1974); *Jones v. Wittenberg,* 323 F.Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzner,* 456 F.2d 854 (6th Cir. 1972). To justify an abridgement, the state must demonstrate (1) that it has a substantial interest in promulgating its restrictive regulation; and (2) that it has chosen the least restrictive means of achieving its goals. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Jackson v. Godwin,* 400 F.2d 529, 533 (5th Cir. 1968). However, this test does not come into play unless it is determined that the plaintiffs' First Amendment rights are being abridged. We find that the plaintiffs are presently being unjustifiably deprived of the ability to worship in a dignified and meaningful way and that these deficiencies must be remedied even to meet the standards of defendants' own General Order 33. Thus, the plaintiffs are entitled to conduct services weekly and in an area which is not within a few feet of the commodes of their cells. The defendants are accordingly ordered to permit religious services for every inmate of 1B at least once weekly and to permit them to worship in the day room when made available in accordance with the judgment to be entered. Such arrangements will assure plaintiffs the opportunity to worship together in a manner comporting with the accepted definition of a reli-

gious service and with the rights conferred by the First Amendment.

██ We decline, however, to hold that exclusion of plaintiffs from worship with all other members of their faith at HDM is an abridgement of their fundamental First Amendment rights. *Contra, Wilson v. Beame,* 380 F.Supp. 1232 (E.D.N.Y.1974). As the Supreme Court has stated:

". . . the [First] Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In each case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

The needs of institutional security justify precluding plaintiffs from participating in communal services under *Cantwell.* Once the modifications ordered above are implemented, the plaintiffs' freedom to worship will not be "unduly" infringed. *Accord, Sharp v. Sigler,* 408 F.2d 966 (8th Cir. 1969).

### F. *Searches and Surveillance*

1B inmates are searched more frequently and are under tighter surveillance than detainees in the general population in various ways: (1) they are formally and informally counted much more frequently; (2) their cells are normally inspected twice daily by an officer who frequently bangs the cell bars with hammers, while this type of inspection generally occurs only weekly in the case of the general population; (3) shakedowns occur with greater frequency, and when conducted, 1B inmates are searched and required to stand with their backs to their cells while correctional officers search each cell; (4) the inmates in 1B are strip searched after personal visits,

although other detainees are not; (5) institutional memorandum no. 90 authorizes thorough frisks of 1B inmates upon their leaving for and returning from gym activities; and (6) 1B inmates are handcuffed when leaving for Rikers Island Hospital, while general population inmates are not.

Plaintiffs contend that these practices contravene General Order 33, violate the Fourth Amendment's prohibition against unreasonable searches, and deprive them of their rights under the due process clause to be confined under the least restrictive means necessary to assure institutional security.

██ We cannot agree that the admittedly close surveillance of plaintiffs contravenes General Order 33, the purpose of which is to provide "closer observation" (General Order 33, Section 4.48A) for prisoners properly determined to be security risks "than individuals in the general inmate population at large." Nor do we find that the close surveillance imposed on 1B inmates breaches Section 4.48C of General Order 33 which specifies that 1B detainees shall not be deprived of any legally guaranteed right or any privilege enjoyed by the general inmate population at large. Finally, we find no violation of the Fourth Amendment. While we by no means underrate the extent to which submission to a strip search or to the other procedures described constitute an invasion of privacy, nevertheless, the Fourth Amendment prohibits only unreasonable searches. So long as 1B inmates are classified as security risks according to procedures specified below which will afford due process of law, we cannot say (with one exception) that the number or circumstances of the searches presently being made are unreasonable. That exception relates to shakedown practices which must be modified to permit 1B inmates to watch the searching officer while he searches their cells. Nothing in the record justifies the present requirement that the inmate stand with his back to the cell while the search is conducted, a practice which

constitutes not only an invasion of privacy but an unnecessary aggravation of the terms of confinement.

The plaintiffs complain further that their personal property has been mishandled or confiscated during searches of their cells. The testimony on this issue was insufficient to support the allegation. Be that as it may, the modification of searching practices enabling the 1B inmate to watch the searcher during the search should provide adequate protection against unjustified confiscation or other abuse.

### G. Counsel Visits

 Plaintiffs complain that 1B detainees are not allowed to meet in numbers with one or more counsel even though preparation of their defense may require such meetings. However, Warden Thomas testified that HDM had no policy against simultaneous consultations (Tr. pp. 403–05) and that the log book indicated that such consultations have been allowed on a few occasions. We find that the plaintiffs are entitled to confer with their attorney or attorneys in such numbers as may be shown necessary to assure the right to prepare their defenses to the charges for which they are detained.[1]

### H. Personal Visits

There are decided differences in the conditions under which inmates in general population are allowed to conduct visits as compared to persons in 1B.

Inmates in the general population presently receive visits in a metal (telephone sized) booth which has a glass window separating them from visitors and a closed circuit telephone. One side of the booth is open to permit ventilation and more space.

Inmates in 1B receive visits in the same type of small metal booth, but they are locked into the booths during the visiting periods. While visits theoretically last for a half hour, plaintiffs are often kept in the booths for as long as an hour and a half waiting for visitors to arrive or for officers to unlock the booths at the conclusion of the visit. Moreover, if the telephone in the booth is inoperative, the half hour allocated to each visit is shortened by the time required for the visitor to inform a correctional officer and for the officer to transfer the inmate to a booth in which the telephone functions. (Tr. p. 60) During the summer months, the temperature in these booths is so stiflingly hot that some 1B inmates have refused to accept visits rather than submit to the unbearable heat. (Tr. p. 60)

 We find that the use of closed booths for 1B detainees in the summer is so intolerable as to constitute a deprivation of visitation rights under acceptable conditions. We therefore order that visits be made available to 1B inmates on some basis during the summer months which will permit them to see their visitors under conditions which assure tolerable comfort. We suggest that the doors to these booths be unlocked to afford reasonable ventilation. That is the condition under which visits have been provided to the general population up to the present time and while the record reflects that these booths are far from desirable even when the doors remain unlocked, they do afford minimally tolerable physical conditions.

 The plaintiffs also complain that not more than two 1B detainees may receive personal visits at the same time, (Tr. pp. 641, 758) while no such restriction applies to other inmates. (Tr. p. 642) Deputy Warden Brown testified that the reason for the rule is to thwart escape attempts. Although regrettable, we conclude that the rule is justifiable. In any event, neither the plaintiffs nor their visitors suffer any substantially greater inconvenience than do general population visitors, since they, like visitors for 1B detainees, often are required to wait until the second visitation shift

---

1. Plaintiffs also complain that correctional officers overhear conversations between inmates and attorneys when they confer in the counsel room. However, this problem has been cured by the installation of glass enclosures in the counsel room.

because of insufficient visiting space. (Tr. pp. 800, 802)

### I. *Library Privileges*

■ One section of the library contains books of general interest, and the other, legal materials. 1B inmates are not allowed to use the non-legal section of the library although the general population of course can. The defendants argue that this practice is justifiable because a "mini-library" adjacent to the 1B area (a bookcase of library books which are periodically changed) is substantially equivalent to the mix of books that would be available in the library. This is not so. Aside from the fact that the 1B mini-library is located in the outside catwalk to which plaintiffs do not presently have access during lockout hours, the mini-library is so obviously inferior to the range and number of books in the institutional library that the difference constitutes an inequality within the meaning of General Order 33. It is appropriate to note, moreover, that any constraint on access to books is a greater burden on 1B inmates than on other inmates, since they do not, for all practical purposes, participate at all in institutional activities and because the length of their confinement has been, at least for those who were plaintiffs at the time of trial, comparatively long.

In contrast to their preclusion from use of the general library, plaintiffs do have access to the law library, although as a group they are not allowed to spend as long there as are other inmates. Nevertheless, the amount of time allowed to 1B detainees is sufficient in proportion to the number of persons in 1B as compared with the number of men in the general population.

### J. *Gymnasium Hours*

■ At the time of trial, all inmates, including those in 1B, were afforded one 50-minute period of gym per week. Since trial the defendants have been ordered (in separate litigation) to provide five 50-minute periods of exercise weekly to the inmate population at HDM.

*Rhem v. Malcolm,* (S.D.N.Y.1975) 396 F.Supp. 1195 at 1202; *Benjamin v. Malcolm.* The plaintiffs are of course entitled to equivalent exercise time.

### K. *Remaining Issues*

The plaintiffs have not established that access to medical treatment for them has been limited to any substantial degree. (Tr. pp. 66, 363, 443, 447, 486, 490.)

■ The record does not support the claim that items ordered and received by plaintiffs from the commissary are inferior or defective. The prohibition of 1B inmates' visiting the commissary and the requirement that they secure goods by order only (while the general population actually "shops" at the commissary) is justified by the security risk which would be incurred by allowing inmates in 1B to mingle with the general population if they visited the commissary. We note that the problem caused by the plaintiffs' inability to make alternate selections can be alleviated by allowing them to list a number of alternate selections and furnishing them the first alternate selection that is available.

Plaintiffs have established no violation as to the distribution of rule books. No special rule book exists for 1B, nor need there be one since the only special 1B rule, if it is one, is that 1B detainees are required to obey the orders of correction officers. That is a proposition known to all inmates from the time they arrive at HDM.

■ Finally, the plaintiffs failed to prove that their mail was treated in a manner different from that of persons in the general population. They contend, however, that the mail watch sometimes placed on their correspondence violates their rights under the First and Fourth Amendments. Deputy Warden Brown testified that mail watches are placed on both incoming and outgoing mail when required for security reasons in individual cases. (Tr. pp. 649–53) The watch consists of noting addresses and, in some instances, inspecting the contents of the

mail. (Tr. pp. 650, 715) While there was no evidence as to whether the defendants put a watch on mail between a detainee and his counsel, it is clear that the First and Sixth Amendments permit the inspection of such mail only in the presence of the detainee. *Rhem v. Malcolm,* 507 F.2d 333, (2d Cir. 1974) *aff'g in relevant part,* 371 F.Supp. 594, 634 (S.D. N.Y.); *Wilkinson v. Skinner,* 462 F.2d 670 (2d Cir. 1972); *Smith v. Robbins,* 454 F.2d 696, 697 (1st Cir. 1972); see *Wolff v. McDonnell,* 418 U.S. 539, 577, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, we cannot say on the record before us that the watch on other correspondence violates the constitutional rights of detainees. The Supreme Court has recognized that institutional security may, in certain circumstances, justify the decision to inspect, censor and withhold a prisoner's mail. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Those security considerations are equally relevant to an institution which houses pre-trial detainees. Thus, although a detainee must be held under the least restrictive means necessary to assure institutional security, those means may include the need to inspect a detainee's mail.

## II. *Right to Procedural Due Process*

Plaintiffs also assert that defendants have violated their due process rights because they are held in administrative segregation without being given any reason for their placement there and without a hearing to determine whether, in their respective cases, administrative segregation is warranted.[2] Although Joseph D'Elia, the Director of Operations for the Department, testified that in general inmates are placed in 1B because they are viewed as escape risks or security risks (General Order 33, § 4.48B(d)(i) and (j)), it is undisputed that 1B inmates are never informed that they are so classified nor of the basis for the determination.

■ The due process provisions of the Fourteenth Amendment require that inmates in 1B be advised of the reasons for their segregation and an appropriate opportunity to challenge the propriety of their placement.

In strikingly similar circumstances, the Court of Appeals of this Circuit has most recently held that due process safeguards must be extended to federal prisoners prior to their classification as "Special Offenders" or "Special Cases," categories which closely mirror those used to classify persons who are placed in 1B. *Cardaropli v. Norton,* 523 F.2d 990 (2d Cir. 1975).

Specifically, the Court of Appeals in *Cardaropli* found that serious adverse consequences flowing from Special Offender designation inhere in the "total or partial loss of eligibility for substantial benefits normally afforded every inmate." 523 F.2d at 995, n. 11.

The avowed purpose of administrative segregation is to restrict the freedom of 1B inmates to circulate among the general inmate population. General Order 33, § 4.48A. Plaintiffs may not participate in educational programs with the rest of HDM and in general have little, if any, contact at all with detainees other than those housed in 1B. While inmates in the general population may, for example, leave their cell blocks to attend

2. According to General Order 33, § 4.48B, a detainee may be kept in administrative segregation for the following reasons:

"a. Medical Observation
b. Mental Observation
c. Drug Detoxification
d. Escape Risk
e. Suicide Risk
f. Protective Custody
g. Homosexual
h. Cases awaiting the action of the Disciplinary Officer or the Disciplinary Board

i. Cases that present a threat to the good order, discipline or security of the facility
j. Any other type of case the head of the institution deems it appropriate in accordance with Rule 4.48A to place in an Administrative Segregation status."
Mr. D'Elia testified that plaintiffs here were placed in 1B because they fit into categories (d), (i) and (j).

programs, visit the commissary, and take advantage of other activities, the opportunity of 1B inmates to leave the confines of 1B is most heavily limited. This substantially lessened freedom of movement and association with others constitutes a significant deprivation. In addition, the never ending supervision of 1B inmates necessarily deprives them of personal privacy to a degree dramatically greater than other detainees. See General Order 33, § 4.48A; *Wilson v. Beame, supra,* 380 F.Supp. at 1235. That the surveillance is caused by a legitimate concern for institutional security does not alter the fact that the plaintiffs' activities are substantially curtailed. There may be good reasons why 1B inmates are the second class citizens of the detention system, but that they are, there can be no doubt. Consequently, as the *Cardaropli* court has ruled,

"the marked changes in the inmates status which accompany the designation create[s] a 'grievous loss', *Morrissey v. Brewer,* [408 U.S. 471, at 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)]; *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and may not be imposed in the absence of basic elements

of rudimentary due process." *Cardaropli v. Norton,* 523 F.2d at 995.

It follows that 1B inmates are entitled to the procedure protections approved by the Court in *Cardaropli,* 523 F.2d at 995–999, as modified below:

A. An inmate may be placed in segregation in 1B only under the following conditions: First, immediately upon his segregation he shall be given in writing (a) notice of the reasons for his being segregated; (b) a brief description of the evidence relied upon in reaching the decision; and (c) an outline of his right to a hearing, the rights he may exercise at the hearing and the procedure by which the hearing will be conducted.

Second, at any time after he is placed in segregation in 1B an inmate may demand a hearing as to the validity of the decision to segregate him. The demand shall be made in writing and the hearing shall occur not less than twenty-four hours nor more than forty-eight hours after the delivery of the demand to the inmate's immediate custodian.

B. The inmate shall have the right to appear personally at the hearing, to make a statement, to call witnesses and to submit documentary evidence on his own behalf subject to the hearing officer's right "to keep the hearing within reasonable limits." *Wolff v. McDonnell, supra,* 418 U.S. at 566, 94 S.Ct. at 2980.[3]

---

**3.** The inmate is to be fully informed at that time of the evidence against him and afforded a reasonable time to present his side of the case. The defendants disagree as to how much information plaintiffs are entitled to receive. At the hearing Mr. D'Elia testified as to the reasons for placing some of the plaintiffs in 1B (e. g., plaintiffs Giampetruzzi and Cruz had on prior occasions attempted escapes). The Department objects to revealing the sources and facts about other plaintiffs which it characterizes as "confidential." The Court *in camera* heard testimony as to the allegedly confidential material, which falls into three categories:

(1) Information as to persons with whom a plaintiff is believed to associate;

(2) Information obtained by corrections personnel from plaintiffs' outgoing mail;

(3) Information secured from an inmate informant.

The information in categories (1) and (2) is hardly "confidential" since the plaintiff in question obviously himself knows his associates and the contents of his own mail. Accordingly, there is no reason why this evidence should not be disclosed to him for use at the hearing. Except as indicated below, an inmate is also entitled to the *information* supplied by an informant. The informer's privilege—the only item of evidence which may ordinarily be withheld—protects only the *identity* of the informant, *Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 1 L.Ed.2d 639 (1956). Therefore, unless the information in question is such that its disclosure will in itself identify the informant, it must be made available to the inmate. Withholding information should be a last resort, for unless he knows the factual basis on which he has been placed in 1B an inmate cannot effectively challenge any false or inaccurate information on which the decision may have been made.

C. The hearing shall be conducted by a disinterested person who shall have taken no part in reaching the decision to place the inmate in segregation in 1B.

D. While the hearing need not be formally recorded or transcribed, the hearing officer shall keep notes adequate to reflect the content of the proceedings and to furnish a basis for his reaching a decision.

E. Confrontation and cross-examination of witnesses by the inmate shall be required only "in the unusual situation where the [hearing officer] cannot rationally determine the facts" without such a cross-examination. *Cardaropli, supra.* The inmate shall have the right to the assistance of retained counsel or counsel-substitute if, but only if, the inmate is illiterate or "the complexity of the issue makes it unlikely that [he can] collect and present the evidence necessary for an adequate comprehension of the case." *Wolff v. McDonnell, supra,* 418 U.S. at 570, 94 S.Ct. at 2982; *Cardaropli, supra,* at 998.

F. The hearing officer shall be appointed by the warden and shall not have personal knowledge of the facts upon which the decision to segregate the inmate in 1B was based. In the event that the hearing officer determines that the decision to segregate the inmate in 1B was justified, he shall set forth in writing his reasons and his findings of fact, all of which shall be submitted within twenty-four hours of the conclusion of the hearing to the warden for his review. The warden shall, within twenty-four hours thereafter, approve or disapprove in writing the decision of the hearing officer.

G. The status of any detainee held in segregation in 1B shall be reviewed by the warden every thirty days from the date such inmate was placed in segregation for the purpose of determining whether any change of circumstances warrants releasing him from such segregation. *Accord, Aikens v. Lash,* 371 F.Supp. 482, 492 (N.D.Ind.1974).

The Department should take steps to implement the hearing process forthwith. If in accordance with the procedure set forth above, the warden approves findings that an inmate has been properly placed in 1B, then the Department records may make reference to the decision. Otherwise, any reference to plaintiffs' placement in 1B or their classification under General Order 33 must be expunged from Department records. *Accord, Arif v. McGrath* (E.D.N.Y. February 4, 1974).

III. *Visitation Rights For Detainees in Punitive Segregation*

■ The complaint alleges that detainees held in punitive segregation are unconstitutionally denied visitation rights at HDM. While plaintiffs themselves are not presently held in punitive segregation they assert the claim on behalf of those who are, and no question of standing has been raised. In any event, it is clear that denial of visitation rights to detainees held in punitive segregation at HDM would violate the Equal Protection Clause since New York State prisoners are allowed regular visitation rights in similar circumstances and no showing has been made to justify different treatment for City prisoners. See *Rhem v. Malcolm,* 371 F.Supp. 594, 633 (S.D.N.Y. 1974) *aff'd* 507 F.2d 333 (2d Cir. 1974) and further memoranda of the district court in *Rhem v. Malcolm,* 396 F.Supp. 1195, April 23, 1975, filed concurrently with the amended judgment therein.

IV. *Monetary Damages*

■ Monetary damages may not be granted here. Allowance of damages in § 1983 actions is governed by the law of tort liability including the defense of good faith. *Pierson v. Ray,* 386 U.S. 547, 556–57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The test is whether, in enforcing the challenged regulation against a plaintiff, the defendant has acted "sincerely and with a belief that he [was] doing right . . . ." *Knell v. Bensinger,* 522 F.2d 720 (7th Cir. 1975). Nothing in the

record here suggests that the defendants acted in bad faith in establishing the procedures heretofore in effect as to 1B inmates. The defendants applied General Order 33 in good faith and with an honest belief in the constitutionality of their procedures.

In sum, we hold that conditions of confinement for inmates in 1B must, after giving due regard to security precautions, be ameliorated to comport with the standards of equality set by General Order 33; that plaintiffs must be afforded the opportunity to contest their placement in 1B in accordance with the procedures set forth above, and that defendants must afford visitation rights to detainees in punitive segregation. The claim for damages is denied.

The above constitutes the findings of fact and conclusions of law of the court required by Rule 65, Federal Rules of Civil Procedure.

Submit order on notice.