Steven J. ROMER, Plaintiff,

v.

Robert M. MORGENTHAU, Roslynn R. Mauskopf, Glenn S. Goord, James F. Recore and James B. Flateau, Defendants.

No. 99 Civ. 9052(VM).

United States District Court,
S.D. New York.

Sept. 26, 2000.

Steven J. Romer, Ossining, NY, pro se.

Theresa A. Foudy, Robert M. Morgenthau, Dist. Atty., New York County and Special Asst. Corp. Counsel, New York City, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Steven J. Romer ("Romer") brings this action pursuant to 42 U.S.C. § 1983, seeking to redress alleged violations of his civil rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Defendants are New York County District Attorney Robert M. Morgenthau and former Assistant District Attorney Roslynn R. Mauskopf (together, the "DA Defendants"), and Glenn S. Goord, Commissioner, James F. Recore, Director of Temporary Release Programs, and James B. Flateau, Director of Public Information, of the New York State Department of Cor-

rectional Services ("DOCS") (together, the "DOCS Defendants"). Romer pleads four claims: deprivation of a liberty interest through the denial of temporary work release; unjustified publication of his crime; a conspiracy among defendants to violate his constitutional rights; and intentional infliction of emotional distress. Defendants move under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim on which relief can be granted. The Court grants the motion.

## FACTS

Romer, appearing *pro se*, was convicted in 1991 of grand larceny and sentenced to a prison term of seven and one half to twenty-two and one half years. He is currently incarcerated in the custody of DOCS at the Tappan Correctional Facility in Ossining, New York. Romer alleges that DA Morgenthau has held a long-standing grudge against him dating back to an incident in 1984 when Romer, then a practicing attorney, reported a case of jury tampering. Compl. ¶ 18; Ex. A. Romer attributes this grudge to Mauskopf, as well, on account of her former affiliation with the District Attorney's Office and her role as prosecutor at Romer's trial on the grand larceny charge. *Id.* Romer alleges that although Mauskopf repeatedly emphasized at trial that all of Romer's laundered money was lost to his failed business ventures, *id.* ¶ 52–53, she subsequently, at DA Morgenthau's "behest," several times knowingly reported information that Romer had hidden some of the stolen money. *Id.* ¶ 63; Ex. B. Romer claims Mauskopf was the primary source of false information contained in a presentencing report prepared by the DA's Office in connection with Romer's sentencing. *Id.* ¶ 31. Romer charges that DOCS Defendants, "urged and influenced" by DA Defendants, both "directly and indirectly" engaged in discriminatory, illegal behavior in making decisions about Romer's privileges. *Id.* ¶ 31. Specifically he claims that DA Defendants' conduct in composing their presentencing report

prompted DOCS Defendants' alleged acts of discrimination against Romer, such as denial of work release and unjustifiable publication of information about his conviction. *Id.*

### 1. Deception and Work Release Denial Claim

As background and support for his claim that the defendants violated his constitutional rights in denying his temporary work release program, Romer alleges five forms of "deception" by the defendants. First, Romer contends that he was classified as a "Central Monitoring Case" ("CMC"), a designation primarily reserved for serious, organized crime offenders, and that, in violation of DOCS own policies, he was not notified of this classification until two years and eight months later. *Id.* ¶ 32 (citing 7 N.Y.C.R.R. § 1000.4(4), DOCS Directive 0701 § IV–B(1)(c)). The CMC designation carried the effect that Romer's applications for work release required approval by the DOCS Central Office rather than being determined solely by the Temporary Work Release Committee ("TRC") at the prison where he was held.

Romer also asserts that, despite his conviction of a white collar crime, he was imprisoned with the most violent criminals and that he was denied the routine reclassification to medium security status and transfer to a lower security facility provided to inmates with fewer than five years of their minimum sentence remaining. *Id.* at ¶¶ 33, 34. Romer alleges that he filed seven transfer applications over a span of three years when he had only two to five years of his minimum sentence remaining before he was finally transferred from maximum security to a medium security facility. *Id.* These actions, he claims, were part of the same pattern and animus that he alleges were behind four occasions where his work release applications were denied despite his eligibility and recommendations from high-ranking officials for each application. *Id.* ¶ 38. Romer attrib-

utes these denials to false information supplied to DOCS officials by DA Defendants, Mauskopf in particular. He also claims that Recore orchestrated the denials "directly and indirectly, at the behest of [DA] defendants ... with the knowledge, consent and agreement of [DOCS] defendant Goord." *Id.* ¶¶ 36, 41–42, 77.

Concerning the work release denials, Romer asserts that on August 20, 1996 he achieved the highest score on the "temporary-release point system" and was approved for work release by the TRC. *Id.* ¶ 35. Upon review by the DOCS Central Office, Romer's work release application was denied. The rejection was affirmed on appeal by Recore despite Romer's existing job opportunity and recommendations from over 90 sources, including numerous prominent public officials. *Id.* ¶¶ 36–37. Romer submitted a second application after September 1997, as allowed in the first disapproval. Recore again denied the application on appeal at the Central Office, advising Romer not to re-apply until after his parole hearing. *Id.* ¶¶ 41–42. Romer was later denied parole despite an alleged model record and despite having served three to six times the sentencing guidelines established by the New York State Division of Parole. *Id.* ¶¶ 45, 46.

Following Romer's third work release application, his wife allegedly received a letter (not in the record) from a State Assemblywoman explaining that DOCS had informed her, referring to Romer's application, that "work release is not a possibility in a case where there is such a large amount of money for which there has been no accounting." *Id.* ¶ 48. Romer responded, sending copies of his correspondence to Goord and Recore, that Mauskopf and the District Attorney's Chief Financial Investigator, Robert Demarest, had repeatedly declared all the money accounted for. *Id.* ¶¶ 49–51, 53; Plaintiff's Ex. C and D. Nonetheless, the DOCS Central Office denied Romer's third application in August 1998. The dis-

approval stated that "[a] 26 page sentencing memorandum that was prepared by the prosecuting ADA was provided to this Office". *Id.* ¶¶ 55, 57. Romer wrote to Recore questioning why Recore's name rather than that of the Central Office representative was listed as reviewer of his denied application. He alleges that the reviewer identification "CTRLJFR" meant "Central—James F. Recore." *Id.* ¶¶ 58–59, 61; Ex. E. The Central Office's (or allegedly Recore's) denial of Romer's third application was again affirmed by Recore. *Id.* ¶ 62. In response to an open letter Romer addressed to the Governor, Commissioner Goord and Recore, Commissioner Goord allegedly replied in September 1998 that the sentencing memorandum prepared by the prosecuting attorney's office and forwarded to DOCS noted that "[a] large portion of money has never been accounted for." *Id.* ¶ 57.

In December 1998, *The New York Times* published an article which quoted Mauskopf, who had left the DA's office in 1995 to assume an appointment as New York State Inspector General, *id.* ¶ 6, as saying that the prosecutors "were not able to trace" all the stolen money, leaving the impression that Romer "laundered the money and still had it hidden somewhere." *Id.* ¶ 63. Romer wrote to Mauskopf pointing to contrary statements by her and Demarest at trial, and urging her to correct the record. *Id.* ¶¶ 64–66; Ex. F. Romer also wrote to Commissioner Goord and Recore urging reconsideration of his application, disputing the DOCS report, and pointing to an *Albany Times Union* article which appeared in September 1998 in which Flateau allegedly said that Romer was a threat to flee because there was stolen money still missing that Romer could have stashed away. *Id.* ¶¶ 68–71; Ex. G (letter to Goord and Recore, copied to Flateau and Mauskopf). Romer's fourth work release application was disapproved in July 1999. The denial was again affirmed by Recore on appeal in August 1999, at which time Romer was ordered

not to reapply until June 2000. *Id.* ¶¶ 73–75, 77. Romer asserts that defendants should have known that there was no stolen money for which there has been no accounting and that defendants' statements to the contrary are false. He asserts deprivation of his rights to due process under the Fourteenth Amendment by virtue of the alleged misinformation and the consequent denials of his work release applications. *Id.* ¶¶ 78–83.

### 2. Unjustified Publication Claim

Romer secondly claims that the DA Defendants and DOCS Defendants, except Recore, also deprived him of civil and constitutional rights through "unjustified publication" of information concerning his conviction in the March 1999 edition of "DOCS TODAY", the Department's monthly magazine published under Flateau's authority. *Id.* ¶¶ 84, 89. Romer alleges that DOCS had a long-time policy of keeping inmates' conviction history confidential, as illustrated by an article in the May 1999 "DOCS TODAY" and a memorandum issued by Deputy Superintendents of several inmate facilities affirming this uniform policy. *Id.* ¶¶ 85–88, 90. The article acknowledged that, because when an inmate's crime was revealed to the prison population "the potential for violence, threats, and extortion becomes a possibility …, [a]s a result … [n]o inmate is to be allowed to possess any … printed information about another inmate". *Id.* ¶ 90. Romer alleges that despite this policy, with the knowledge, consent and approval of Goord and "directly and indirectly, at the behest" of DA Defendants, Flateau allowed publication of the DOCS TODAY article naming Romer and his offenses. The article, reporting on a court rejection of a petition Romer filed challenging DOCS's denying him Merit Time, stated that "[a] disbarred Manhattan attorney who was sentenced in 1992 to a term of 7½ to 22½ years for stealing more than $6 million from various clients, inmate Romer had high school, college and law school degrees prior to his incarceration." *Id.*

¶ 91; Plaintiff's Ex. I. Romer further alleges that the comment was published in order to injure him physically and emotionally, and to subject him to "vexation and harassment," which occurred because the article was widely distributed to various DOCS facilities and their inmates. *Id.* ¶ 93–94.

### 3. Conspiracy and Intentional Infliction of Emotional Distress

Romer further alleges that the DA Defendants and DOCS Defendants except Flateau met and communicated from January 1991 through August 1999 by phone, letters, memoranda, fax, and e-mail to conspire to violate his civil and constitutional rights. *Id.* ¶ 101–102. He also claims intentional infliction of emotional distress in that defendants individually caused him physical and emotional distress through "extreme, outrageous and unjustified" actions. *Id.* ¶ 109.

As relief for the four causes of action he pleads, Romer demands both compensatory and punitive damages from defendants in their individual capacities, and alleges that defendants are not entitled to assert official immunity.

## DISCUSSION

### A. Standards of Review

A Fed.R.Civ.P. 12(b)(6) motion to dismiss hinges on a claim's "legal sufficiency." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). In considering the motion, the court must examine the factual allegations of the complaint, including exhibits to the complaint and documents or statements incorporated in it by reference. *See Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991). For purposes of the motion, the factual pleadings in the complaint are deemed true and all reasonable inferences are drawn in plaintiff's favor. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.,*

69 F.3d 669, 673 (2d Cir.1995). Dismissal is warranted if it appears beyond doubt that under no set of facts would plaintiff be entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Second Circuit has stressed that this Rule 12(b)(6) motion standard applies with particular force when a plaintiff alleges civil rights violations or appears *pro se.*[1] *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994).

Liability under § 1983 requires that the defendants (1) engage in some action under color of state law (2) in a manner depriving plaintiff of rights, privileges, or immunities secured by the Constitution. *See* 42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

B. *Applicable Immunity Defenses*

██ A threshold legal issue raised here by both sides, and potentially dispositive of the motion as to some or all of the defendants, relates to whether defendants may be entitled to assert official immunity and what forms of immunity may be applicable. The Second Circuit has enunciated some guiding principles to govern this inquiry.

> [T]o the extent that such a claim is asserted against the state official in his *official capacity,* he may assert the state's *Eleventh Amendment immunity* against suit, but he may not assert a personal official privilege of absolute or qualified immunity. To the extent that such a claim is asserted against him in his *individual capacity,* he may assert privileges of *absolute or qualified immunity* but may not assert immunity under the Eleventh Amendment.

*Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) (emphasis added). As complaints often fail to specify the capacity in which defendants are sued, courts must make that determination by examining the "course of proceedings." *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Hrubec v. City of New York,* No. 93 Civ. 8367, 1995 WL 422023 *2 (S.D.N.Y. July 18, 1995) (applying *Kentucky v. Graham* ); *Shabazz v. Coughlin,* 852 F.2d 697, 700 (2d Cir.1988) (holding that plaintiff's request for punitive and compensatory damages and defendant's failure to raise an Eleventh Amendment defense indicated that the parties believed the suit against defendant was filed in his individual capacity). When plaintiff seeks punitive damages and defendants claim qualified immunity, an individual capacity suit may be inferred, although ambiguous pleadings by a *pro se* plaintiff may be treated as brought in both capacities. *See Ippolito v. Meisel,* 958 F.Supp. 155, 160 (S.D.N.Y. 1997), *applying Ying,* 996 F.2d at 530; *see also Rodriguez v. Phillips,* 66 F.3d 470, 482 (2d Cir.1995).

██ State officials sued in federal court for actions taken in their official capacities can assert Eleventh Amendment immunity, which bars such suits for money damages brought by private parties under § 1983 if the state is the real, substantial party at interest. *See Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Ying,* 996 F.2d at 529 ("[When] a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against a state ... [allowing] Eleventh Amendment immunity").

██ Here, the DOCS Defendants invoke Eleventh Amendment immunity to bar Romer's claim to the extent it may purport to sue the State or its officers in their official capacity. However, the

---

1. DA Defendants argue that the usual pro se leniency should not apply to Romer's complaint because he was an attorney duly admitted to practice before New York State and federal courts. *See* Memorandum of Law in support of Defendants Robert M. Morgenthau's and Roslynn R. Mauskopf's Motion to Dismiss the Complaint as to them, at 2, n., (citing *Kuriakose v. City of Mount Vernon,* 41 F. Supp 2d 460, 465 (S.D.N.Y.1999)).

course of these proceedings indicates that such a defense is inapplicable here because the defendants are being sued in their individual capacities. The Complaint is explicit in this regard with respect to all five defendants (Compl.¶¶ 5-9), and the fact that Romer seeks monetary damages rather than injunctive relief further implies that he intended to sue the defendants in their individual capacities. Also, the DA defendants, unlike the DOCS defendants, respond to Romer's complaint as an individual-capacity suit, asserting qualified and absolute immunity defenses rather than an Eleventh Amendment-based defense, which further suggests that the complaint is not ambiguous in this respect. DOCS Defendants' assert that Romer's action may qualify as an official capacity suit because of Romer's focus on actions and omissions allegedly permitted by DOCS policies. However, this factor does not necessarily make the State the "real party" because the enforcement of an unconstitutional state-created policy does not divest a state official of individual liability. *See Farid v. Smith*, 850 F.2d 917, 921 (2d Cir.1988) (holding that even if defendant carried out state policy, the Eleventh Amendment does not protect him from personal liability, although he may be able to assert absolute and qualified immunity).

*Absolute Immunity*

■■ Prosecutors and former prosecutors facing individual capacity liability can claim absolute or qualified immunity. *See Quartararo v. Catterson*, 917 F.Supp. 919, 954 (E.D.N.Y.1996) (extending prosecutorial immunity to former prosecutors for their role in parole process as constituting acts directly related to former prosecutions). Absolute prosecutorial immunity is generally limited to litigation-related activities and decisions whether to prosecute. *Ying*, 996 F.2d at 530; *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (allowing absolute immunity for "initiating a prosecution" and activities "intimately associated with the judicial phase of the criminal process");

*see also Dorman v. Higgins*, 821 F.2d 133, 138–39 (2d Cir.1987) (immunity for preparation and presentation of presentence reports); *Taylor v. Kavanagh*, 640 F.2d 450, 451–52 (2d Cir.1981) (immunity for prosecutor's acts related to sentencing proceedings). A prosecutor's motive is irrelevant since "an allegation that it was done as part of a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman*, 821 F.2d at 139; *Daloia v. Rose*, 849 F.2d 74, 75 (2d Cir.1988) (absolute immunity in transmitting false information to parole authorities); *Allen v. Thompson*, 815 F.2d 1433, 1434 (11th Cir.1987) (extending absolute immunity to prosecutor's alleged malicious letter to Parole Commission); *see also Lee v. Willins*, 617 F.2d 320 (2d Cir.1980); *Dory v. Ryan*, 25 F.3d 81 (2d Cir.1994).

■ Prosecutors sued for actions that are administrative or non-official prosecutorial functions do not receive absolute immunity. *See Fields v. Soloff*, 920 F.2d 1114, 1120 (2d Cir.1990) (denying immunity because forcing a face-to-face identification is "not integral ... [to] whether or not to institute a prosecution or to the conduct of judicial proceedings"). *See also Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (no absolute immunity for fabricating evidence or for out-of-court comments at a press conference); *Martin v. Merola*, 532 F.2d 191, 195 (2d Cir.1976) (Lumbard, J., concurring) (holding that there is no immunity for acts which are "clearly beyond the proper exercise of [a prosecutor's] authority and exceed any possible construction of the power granted to his office").

*Qualified Immunity*

■ Prosecutors, however, like other government officials, may receive qualified immunity for discretionary functions. Qualified immunity applies to the discretionary functions of state officials if their

conduct does not violate "clearly established" statutory or constitutional rights of which "a reasonable person would have known." *See Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Violation of a clearly established right is grounded on whether, based on recognized law and precedent, the right was defined with "reasonable specificity" and whether statutory or case law supports the existence and constructive notice of the right plaintiff claims was violated, such that a reasonable official would have known his actions were unlawful. *See Shechter v. Comptroller of City of New York,* 79 F.3d 265, 270–72 (2d Cir. 1996) (holding that the question is not whether defendants should have known of an abstract federal right but whether they should have known that their acts specifically violated a plaintiff's right, since too broad a definition of specificity would turn "qualified immunity ... [into] virtually unqualified liability simply by [plaintiff] alleging violation of extremely abstract rights") *quoting Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Even where an action is found to have been a violation of a clearly established right or rights, qualified immunity still applies if it was "objectively reasonable" for defendant to believe that his acts did not violate those rights in that "officers of reasonable competence could disagree" on their legality. *See Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). The test renders irrelevant any allegations of wrongful intent or malice. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Qualified immunity protects all "but the plainly incompetent or those who *knowingly violate* the law." *Malley,* 475 U.S. at 341, 106 S.Ct. 1092 (emphasis added). Qualified immunity is the rule rather than the exception, and is granted barring material issues of fact; if denied on a principle of law, the decision is immediately appealable. *See* 28 U.S.C. § 1293; *Cartier v. Lussier,* 955 F.2d 841 (2d Cir.1992).

With these immunity principles in mind, the Court turns to Romer's underlying Fourteenth Amendment claims to analyze whether clearly established rights were violated and whether the defendants could be held liable for such actions.

### C. Personal Involvement

Defendants next contend that Romer has failed to state a claim because he has not adequately established the personal involvement of some of the defendants. For liability to exist under § 1983, a defendant must be personally involved in the underlying conduct or events in that he "subjects, or causes [plaintiff] to be subjected" to an alleged constitutional violation. 42 U.S.C. § 1983; *Monell v. Department of Soc. Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, not only must a violation be sufficiently alleged, but also defendants' personal connection to the violation. The Supreme Court looks at standard tort liability principles to determine whether a sufficient causal link exists between misconduct and deprivation of a right, holding a defendant liable "for the natural consequences of his actions." *Malley v. Briggs,* 475 U.S. 335, 344–45 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Mere allegations that defendants knew of the wrongs does not establish personal involvement. *See De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (dismissing the action because an allegation that acts were "caused by, known to and ratified by" defendant contained no specific supporting facts). But direct participation is not needed if defendants "learned of [a] wrong and failed to correct it." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Conclusory allegations cannot sustain a § 1983 claim, which requires specific facts under which a court could grant relief. *See De Jesus* 87 F.3d at, 70 ("A complaint which consists of conclusory allegations unsupported by factual

assertions fails even the liberal standard of Rule 12(b)(6)").

▮ Defendants argue that even if Romer sufficiently alleged a "clearly established" liberty interest precluding qualified immunity, the claim warrants dismissal due to absence of defendants' personal involvement in the claimed violation. Romer contends DOCS Defendants "subjected" him to a violation of his rights by denying him work release and publishing information about his conviction, and that DA Defendants "caused him to be subjected" to violation of rights by urging denial of his work release applications and supplying false information to cause DOCS's denials, thus satisfying the pleading prerequisites of § 1983 and *Monell*. Romer further alleges that DOCS Defendants "engaged in an illegal discriminatory course of conduct ... on information and belief ... urged and influenced" by DA Defendants through their false information. *Compl.* ¶ 31. Reinforcing his argument that defendants were personally involved in the alleged wrongful conduct, Romer points to his detailed complaint; to Mauskopf's presentencing memorandum and her statements quoted in the press; to the Assembly-woman's letter relaying DOCS officials' continuing belief that work release was not appropriate in Romer's case because of the allegedly missing money; and to his own letters bringing the alleged misinformation to defendants' attention. DA Defendants counter that Romer's contentions present only conclusory allegations, relying on little more than information and belief to allege that denial of his work release applications occurred at DA Defendants' "behest".

On the record before the Court, there appears no sufficient basis in Romer's allegations to infer personal involvement by DA Morgenthau and Commissioner Goord in the actions that underlie his claim for denial of work release. The demonstration of personal participation by any of the defendants, with the exception of Flateau,

in Romer's unjustified publication claim is even more tenuous. Conceivably, Flateau may have had some role in a Department-wide publication prepared under his authority. The remaining basis for sustaining an allegation of defendants' personal involvement in Romer's action relates to his work release denials and consists of Mauskopf's role, under a causal standard of foreseeability, in the presentencing memorandum and later public remarks, and to Recore's role in the decisions to reject Romer's applications.

Romer nevertheless seeks to fill in the evidentiary gaps in his personal involvement allegations through general assertions in his conspiracy and infliction of emotional distress charges to the effect that the defendants regularly communicated among themselves at meetings, by telephone, in writing and other means and otherwise engaged in intentional conduct in furtherance of the acts Romer contends violated his constitutional rights. Presumably, Romer's theory is that, were his complaint to survive the motion to dismiss, he would be able through discovery to develop a record substantiating his general pleadings. This aspiration need not detain the Court; Romer is entitled to proceed only if the facts he seeks to prove would state a legally cognizable claim. *See Armstrong*, 143 F.3d 698. Here, Romer cannot proceed because, as discussed below, even if the personal involvement standard were satisfied as to any defendants, he cannot demonstrate that he was deprived of a liberty interest constitutionally recognized and protected, nor can he overcome defendants' invocation of applicable immunity.

## D. *Denial of Work Release*

As a first claim against defendants Mauskopf, Morgenthau, Goord and Recore, Romer alleged various acts of deception that violated his civil rights under the Constitution. After some initial confusion about the nature and extent of his first count, Romer clarified at an October 28, 1999 conference before Judge Pauley, the

previous judge assigned to this case, that the first count stated a claim for a violation of Romer's alleged liberty interest in work release. This understanding of Count One was memorialized in a January 10, 2000 scheduling order by Judge Pauley.

1. *Due Process Violation*

Defendants argue that (1) work release is not a valid liberty interest; (2) even if it could be construed as a liberty interest, it is not clearly established, and would thus warrant qualified immunity (and according to DA Defendants, absolute prosecutorial immunity as well), and (3) Romer's allegations of a liberty interest lack particularity because they are stated in conclusory terms.

 A due process violation may be found only with regard to (1) a "liberty interest" arising out of the federal Due Process Clause or state law, which is both (2) "clearly established" (3) and deprived through denial of due process. *See Kelly Kare, Ltd. v.. O'Rourke*, 930 F.2d 170, 177 (2d Cir.1991). A state prison regulation by which corrections officials dispense privileges or punishments may create a liberty interest sufficient to implicate due process concerns when a denial or punishment constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[2] The Supreme Court in *Sandin* declared that state-created liberty interests are "generally limited to freedom from restraint." *Id.* The Second Circuit has interpreted this guidance to apply to wrongful segregation and confinement. *See Lee v. Governor of*

*New York*, 87 F.3d 55, 58–59 (2d Cir.1996). Courts in this District vary in determining what form or degree of confinement is required to constitute an "atypical hardship," with much of the focus after *Sandin* on how many days a literal confinement or segregation must continue in order to constitute deprivation of a liberty interest. *See Lee v. Coughlin*, 902 F.Supp. 424, 431 & n. 8 (S.D.N.Y.1995) (376 days is enough, in comparison with *Sandin*, where 30 days was not enough, to implicate a liberty interest). *See also Campo v. Keane*, 913 F.Supp. 814, 821 (S.D.N.Y.1996) (discussing the differing views expressed by other courts in the Southern District as to what constitutes an "atypical hardship" after *Sandin* ).

 In this connection, illustrating where the line may be drawn for the purposes of this inquiry, the Supreme Court noted a distinction between "being deprived of a liberty one has ... and being denied a conditional liberty that one desires." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (finding delay—or denial—of admittance into temporary release programs not an "atypical hardship" as it made inmate no worse off than before he applied). *See Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir.1999) (finding a liberty interest in continued participation in work release program such that withdrawal of the privilege constitutes an "atypical and significant" deprivation); *see also Pugliese v. Nelson*, 617 F.2d 916, 922–23 (2d Cir.1980) (holding a prisoner's interest in future parole not a liberty interest under *Greenholtz* and not-

**2.** *Sandin* established the current rule and practice of courts examining the nature of the deprivation, rather than the precise statutory language, to determine whether a prisoner has a liberty interest. Previously, analysis focused on whether there was mandatory language in state law or regulations that placed substantive limitations on official discretion, such as the fulfillment of conditions mandating parole release. *See Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462–

63, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Supreme Court formulated the *Sandin* test to address the fallibility of the "mandatory language" doctrine, under which prisoners were increasingly examining statutory wording in microscopic detail in the hopes of finding any remotely mandatory language to use in asserting a liberty interest. *See Sandin*, 515 U.S. 472 at 480–82, 115 S.Ct. 2293, 132 L.Ed.2d 418.

ing the considerably greater weight given to an "alleged liberty interest [that] is in the nature of 'a bird in the hand' rather than one in the bush"); *Dugar v. Coughlin*, 613 F.Supp. 849, 854–57 (S.D.N.Y. 1985) ("cases finding an interest protected by due process with respect to removal from a [temporary release program] do not require the recognition of a similar interest with respect to initial determinations regarding participation"). This distinction applies to the denial versus revocation of work release, and no atypical hardship, or "major disruption" in inmate environment, occurs when the prisoner "simply continue[s] in the regular prison program" after denial. *Greenholtz*, 442 U.S. at 9, 99 S.Ct. 2100; *see also Lee*, 87 F.3d at 58 (holding that denial, as opposed to revocation, of work release is not a liberty interest as inmate's environment remained unchanged). Thus, while revocation of work release has been held to implicate due process concerns, access to work release in the first place has not. Both prior to and after *Sandin*, denial of work release has been held *not* to infringe upon a liberty interest. *See Lee*, 87 F.3d 55 (no inmate liberty interest in participating in temporary work-release), *Dearmas v. I.N.S.*, 1993 WL 213031 at *6 (S.D.N.Y.1993) ("it is well settled that prisoners have no constitutional right to participate in work release programs"); *West v. Keane*, No. 93 Civ. 6680, 1997 WL 266977, at *4 (S.D.N.Y. 1997) (no inmate liberty interest in vocational programs).

Defendants claim that work release is not a liberty interest and, alternatively, not a "clearly established" one. The Court agrees. The case law described above leaves this proposition beyond dispute. Romer concedes that work release is a privilege and not a right. Nonetheless, despite the clear distinction that such an interest may exist only when prisoners are deprived of an already-existing privilege rather than when a privilege is denied altogether, Romer offers pre–1980 precedent to support his assertion of a liberty interest (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint, "Plaintiff's Memo," at 16). This Court, in the light of *Greenholtz* and *Sandin* and the cases in this Circuit resting on their reasoning, must reject Romer's argument. These cases have compelled a number of fundamental changes regarding inmate liberty interests that render inapplicable[3] or distinguishable[4] much pre–1980 precedent cited by Romer. *Sandin*, 515 U.S. at 480–82, 115 S.Ct. 2293 (criticizing pre-*Sandin* doctrine which based determination of a liberty interest on statutory construction rather than the nature of the deprivation). *See Boothe v. Hammock*, 605 F.2d 661 (2d Cir.1979) (rejecting, through application of *Greenholtz*, prior Second Circuit precedent holding that prisoners had a due process interest in initial parole determinations); *Dugar*, 613 F.Supp. at 856 (applying

---

**3.** In particular, the continued validity of both *Tracy v. Salamack*, 572 F.2d 393, 395 (2d Cir.1978) and *Cardaropoli v. Norton*, 523 F.2d 990 (2d Cir.1975), was cast into doubt by subsequent precedent. The *Dugar* court, 613 F.Supp. at 856, took issue with *Tracy's* finding that due process rights attach to the initial determination regarding participation in a temporary release program, and distinguished *Cardaropoli*, as the court did not find that a prisoner had a liberty interest in work release per se, but only to notice and an opportunity to rebut a "special offender" classification precluding his eligibility for work release or early parole. *See id. Dugar* considered the reasoning in *Cardaropoli*, as pre-*Greenholtz*, to be inapposite. *See Dugar*, 613

F.Supp. at 856 n. 4. *See Pugliese*, 617 F.2d at 923 (finding the *Cardaropoli*, holding that classifications indirectly hindering or precluding eligibility for a temporary release program warranted due process protection, no longer good law under *Greenholtz* ).

**4.** *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and *Tunin v. Ward*, 78 F.R.D. 59, 63–65 (S.D.N.Y.1977) apply to parole decisions rather than work release, which have later been distinguished. *See, e.g., Quartararo*, 917 F.Supp. at 955–57 (justifying the distinction as work release involves conditions of confinement rather than length of sentence).

*Boothe*'s extension of *Greenholtz* to all temporary release programs).

Alternatively, Romer claims indirect deprivation of a liberty interest on the theory that denial of work release will deprive him of "substantial benefits" relating to sentencing as well as confinement matters, impacting his life outside the prison. In other words, Romer contends that *Sandin* and its progeny apply only to the conditions of day-to-day confinement inside the prison, and not to aspects of sentencing. He cites *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where the Supreme Court found a violation of liberty interest in the revocation of marks for good behavior which reduced a prisoner's sentence, and argues by analogy that, since denial of work release will have a similar negative impact upon his parole review and thus sentence, it is an atypical hardship and therefore a liberty interest. This reasoning is untenable on several grounds discussed in recent case-law redefining inmate liberty interest issues.

First, absent specific supportive facts, speculation on a conceivable impact on sentence or parole that might be ascribed to a denial of work release does not constitute an atypical hardship. The argument was addressed in a similar case, *Brooks v. Di-Fasi,* No. 93 Civ. 0197E, 1997 WL 436750 at *3 (W.D.N.Y.1997), where an inmate claimed that his inability to participate in work release infringed on a liberty interest as it "might have hindered his ability to receive an early parole or release." The *Brooks* court found the claim "concededly speculative" and held that it "fail[ed] to allege interference with a protected liberty interest." *Id.; cf. Pugliese,* 617 F.2d at 923 (overturning *Cardaropoli*'s recognition of liberty interest status as to a classification which could hinder or preclude eligibility for rehabilitative programs on the grounds that such programs are "mere possibilities" rather than rights). This Court concurs with the reasoning in *Brooks* and *Pugliese.* Consequently, the Court sees no need to decide whether and

what particular facts may be sufficient to constitute atypical hardship under Romer's theory.

Secondly, although Romer claims that *Sandin* suggests a distinction between terms of confinement and sentencing, such reasoning is directly contradicted by the later cases in this Circuit holding that parole is distinct from work release because the former alters length of sentence and the latter the terms of confinement. *See Quartararo,* 917 F.Supp. at 955–57. In addition, under the reasoning of *Greenholtz,* the possibility of parole release does not qualify as a liberty interest. Finally, Romer's reliance on *Wolff* is unavailing. That case concerned what kind of due process denial implicated a deprivation of a liberty interest, while the question of the particular liberty interest that was at stake was defined "in terms of the forfeiture of good time as a disciplinary measure," *id.* at 581 n. 1, 94 S.Ct. 2963, 94 S.Ct. 2963, and dealt with the revocation of a privilege already bestowed, rather the denial of a privilege sought, which is the focus here. As noted above, this distinction between the revocation of a prisoner's earned privileges and the denial of privileges sought has been emphasized in case-law. *See Greenholtz,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668, *Kim,* 182 F.3d 113, and *Lee,* 87 F.3d 55.

■ As a distinct argument, Romer seeks to implicate a liberty interest in DOCS's denial of his work release applications by the assertion that a "claim of constitutional magnitude arises when a prisoner alleges there is information in his file, the information is false, and that the information is likely to be relied on in a constitutionally significant way." (Plaintiff's Memo at 10, *citing Lowrance v. Coughlin,* 862 F.Supp. 1090, 1119 (S.D.N.Y.1994)). However, Romer's claim here is for damages from having been deprived of due process rather than for expungement of false information likely to be relied upon in a constitutionally significant way. In order to recover damages in

this action, he must demonstrate that his rights have been violated, not that they might be violated in the future. And, even so, if Mauskopf's statements that a large amount of the stolen money remained unaccounted for were taken to be false, this information, if employed by DOCS, was not relied upon "in a constitutionally significant way". The false information may have been one or perhaps even the only reason why Romer was denied work release. As determined above, however, work release is not per se a constitutional entitlement or right. Prior to its being conferred, it is only a privilege to which the inmate has no inherent constitutional claim. Endorsing this principle, the court in *Pugliese*, 617 F.2d at 923, established that actions that indirectly "hinder or preclude" work release did not give rise to liberty interests on that account alone.

■ Romer also alleges that the denial of work release caused by Mauskopf's false information will have an effect on his chances for parole, which has been recognized as a liberty interest. Thus, he contends, defendants are violating his due process rights by keeping false information in his file that is "likely to be relied upon in a constitutionally significant way." *See Lowrance*, 862 F.Supp. at 1119. The Court disagrees. As noted above, and as the *Brooks* court held in dealing with a similar issue, speculation about a possible future impact upon parole does not sufficiently allege interference with a liberty interest. *See Brooks* 1997 WL 436750 at *3. Any effect on Romer's parole of the Central Office's reliance on the alleged misinformation in denying him temporary

work release is entirely speculative. To the extent that Romer argues that such information remains in his file and may be relied upon in the future, he has not stated a constitutional claim for which damages may be recovered. Romer's allegations fail to implicate a present liberty interest. Thus, there can be no corresponding deprivation of due process or constitutionally significant impact, warranting dismissal of Romer's denial of work release claim.

### 2. *Immunity Defenses*

■ Alternatively, all defendants claim qualified immunity from Romer's claim, and DA Defendants allege absolute immunity. Given the Court's determination that Romer's pleadings do not demonstrate a sufficient constitutional liberty interest, consideration of the form of immunity which defendants may assert is unnecessary. In this regard, the Court would observe only in passing that qualified immunity would be warranted here because, as concluded above, even if defendants knowingly used false information to subject Romer to a denial of work release, any sufficiently-alleged liberty interest in such action is far from "clearly established" given the weight of precedent against recognizing work release as a liberty interest whose denial causes constitutionally significant injuries. *See* discussion *supra*; *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727 (allowing qualified immunity if defendant "does not violate clearly established" rights of which "a reasonable person would have known"). *See also Quartararo*, 917 F.Supp. at 965.[5]

---

**5.** The *Quartararo* court, in addressing a near-identical set of circumstances, found that reasonable prosecutors could believe they were not violating plaintiff's rights in communicating information to other officials who were evaluating plaintiff's continuing work release eligibility, on the ground that

[e]ven assuming knowledge of the fabrication at the time that such statements were made [to the media], the Court regards the relationship between the making of such statements, and the plaintiff's constitution-

ally protected interest [in] continued participation in the work release program, to be too tenuous to permit the conclusion that a reasonable prosecutor, or former prosecutor, would know that he was violating established federal rights.

*Id.* at 967, n. 24. Thus, applying the reasoning of *Quartararo* here, even if access to work release constituted a clearly established constitutional right, the link between DA Defendants' statements and their subsequent influence on DOCS's decisions rejecting Romer's

Consequently, having concluded that there is no liberty interest at stake here and that defendants retain qualified immunity because any interest alleged is not clearly established, the Court finds that Romer cannot sustain an action for due process violation by DOCS's denial of his work release applications.

### E. *Unjustified Publication*

Romer's second claim is that DOCS Defendants Goord and Flateau "directly and indirectly, at the behest" of DA Defendants, violated his constitutional rights by publishing information about his conviction and distributing it throughout the DOCS prison population. Compl. ¶ 91. Romer claims that such publication constitutes a violation of a clearly-established constitutional right, precluding defendants' claim of qualified immunity, and that the publication demonstrates defendants' deliberate indifference to Romer's risk of harm. Defendants dispute these claims and assert qualified immunity.

#### 1. *"Clearly Established" Constitutional Right*

■■■ Romer's arguments concerning the DOCS TODAY article at issue suggest that defendants' action is a per se violation of the Constitution by reason that the publication and distribution of such information runs counter to certain established DOCS policies that prohibit inmates from possessing printed information about other inmates. Defendants argue both that Romer fails to specify exactly what clearly-established constitutional right the DOCS TODAY publication allegedly infringes and that, in any event, no such right exists.

Defendants construe Romer's claim as alleging a violation of his constitutional "right to privacy" against government access or disclosure of personal information, and argue that such a right does not apply to information like criminal records which are already in the public domain. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (finding that as arrest records contain "information readily available to the public", disclosure was not a constitutional violation); *Smith v. Coughlin*, 727 F.Supp. 834, 842–43 (S.D.N.Y. 1989) (no protection against disclosure of an ongoing investigation). The Court agrees. Because the information disclosed in the DOCS TODAY article was already in the public domain by virtue of having been derived from Romer's criminal records, as well as having been described by the press, Romer cannot claim a constitutional violation against the defendants for republishing facts from those public records. Although Romer cites to several DOCS policy statements that the publication apparently violated, the existence of any such internal policy does not create a constitutionally recognized liberty or property interest on which a due process claim may be based. Moreover, a violation of a DOCS regulation like the policy against disclosure of prisoner conviction information does not, per se, transform the publication of covered information into a constitutional offense against privacy rights. *See generally Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir.1995); *Borucki v. Ryan*, 827 F.2d 836, 848 n. 18 (1st Cir. 1987).

■■■ By the same token, state officials are qualifiedly immune from civil damages in performing discretionary functions if their conduct does not violate "clearly es-

---

work release applications is tenuous at best. The *Quartararo* court found that the district attorneys had not "violated [inmate's] clearly-established federal procedural due process rights attending his removal from the work-release program[,] by communicating false information to the DOCS ... [and] making statements to the media that were designed to damage [his] ability to continue successfully

in the work release program." *Quartararo*, 917 F.Supp. at 965. Since inmates, assuming compliance with terms and conditions governing the privilege, have a constitutional right to continue in work release already approved, but not to *be granted* work release (the issue here), it follows that the *Quartararo* holding would apply here with even greater strength. *Cf. Greenholtz, supra.*

tablished" statutory or constitutional rights of which "a reasonable person would have known." *Harlow*, 457 U.S. at 817–18, 102 S.Ct. 2727. Allowing any general allegation of official misconduct to be invested with the import and consequences of a due process violation would so broaden the definition of "clearly established" as to destroy qualified immunity and divest state officials of the defense. For this reason, in order for Romer's claim to prevail, he must show that defendants' specific actions in allowing the publication constituted a due process violation. This Court finds that he has failed so to demonstrate.

### 2. Deliberate Indifference

■ Section 1983 allows claims against prison officials for their "deliberate indifference" to an inmate's "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that deliberate indifference requires "something more than negligence ... [but] less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). The prison context is unique in that, because those in custody are owed an affirmative duty of protection, liability may arise for officers and supervisory officials based on "deliberately indifferent failure of custodial officers to protect an inmate from violence by other prison residents." *Villante v. Department of Corrections of City of New York*, 786 F.2d 516, 519 (2d Cir. 1986). Even though the injury need not be significant, it must be "sufficiently serious" as to deny plaintiff "the minimal civilized measure of life's necessities." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999). Words alone without physical injury are insufficient as they indicate only "potential" serious harm. *See Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y.1998). Deliberate indifference itself requires a prison official to "knowingly disregard ... an excessive risk to inmate health or safety" and that the official "be both aware of facts from which the inference could be drawn that a substantial risk

of serious harm exists, and he must also draw the inference," *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, thus acting in a way "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Romer claims that Flateau's publication of information about his conviction, allegedly at the behest of DA Defendants and with approval of Commissioner Goord, deprived him of his Fourteenth Amendment rights by manifesting deliberate indifference to a substantial risk of serious harm to Romer. Romer points to a stated DOCS policy against releasing inmates' conviction information, and claims that as a result of the publication his hypertension, caused by defendants' cumulative unlawful acts and constituting an allegedly sufficiently serious physical injury under the deliberate indifferent test, worsened significantly. Romer claims that consequently he now requires two medications and a special diet. He also alleges having suffered "vexation and harassment" and exposure to other potential violence that Flateau and Commissioner Goord either knew or should have foreseen. Romer alleges that the DOCS policy, combined with the distribution of the publication around the prison and with the fact that the information concerning convictions was not otherwise readily accessible to inmates and therefore not a matter of "public record," indicates deliberate indifference.

Romer's deliberate indifference claim is insufficient on several grounds. First, as already determined above, Romer fails to allege any facts sufficient to sustain any personal involvement by either DA Defendants or DOCS Defendants. He merely asserts, conclusorily upon information and belief, that Flateau caused the article to be published at the "behest" of DA Morgenthau and Mauskopf. But even assuming personal involvement by DA Defendants, the claim still fails as to them, as they correctly point out that under the Eighth Amendment prison officials may have a

duty to protect the health and safety of inmates in their custody, but that duty does not extend to prosecutors. Defendants secondly dispute that Romer has established having suffered sufficient physical harm. If arguably for the purposes of deciding this motion Romer's claimed physical injury of hypertension as a causally independent condition were deemed enough to allege physical injury, *see Geller v. Delta Air Lines, Inc.*, 717 F.Supp. 213 (S.D.N.Y.1989) (finding allegations of hypertension as presenting a factual issue as to whether a significant physical injury was alleged), Romer's allegation is not that the DOCS publication caused his hypertension. Rather, his complaint reduces to a claim that the defendants' action aggravated an already-existing condition precipitated by the repeated denials of Romer's requests for work release privileges to which, as the Court finds above, he had no constitutional entitlement. Furthermore, Romer does not claim that he was physically harmed by other prison inmates, as specified in *Villante*, 786 F.2d at 519, as a result of the publication. The alleged "vexation and harassment" as well as the speculative "potential" for future violence are insufficient to allege adequate present physical injury. *See McPherson*, 174 F.3d 276; *Shabazz*, 994 F.Supp. 460. For the foregoing reasons, this claim is dismissed.

### F. *Conspiracy*

A valid claim of conspiracy under § 1983 to violate a complainant's constitutional rights must contain allegations of (1) a conspiracy itself, plus (2) actual deprivation of constitutional rights. A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. *See Malsh v. Austin*, 901 F.Supp. 757, 765 (S.D.N.Y.1995). Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights. *See id.*

To withstand a motion to dismiss, the conspiracy claim must contain more than "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir.1997); *Shabazz v. Pico*, 994 F.Supp. 460, 467 (S.D.N.Y.1998) (holding that a mere allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Specifically, plaintiff must provide some factual basis supporting a "meeting of the minds", such as that defendants "entered into an agreement, express or tacit, to achieve the unlawful end"; plaintiff must also provide "some 'details of time and place and the alleged effects of the conspiracy.'" *Warren v. Fischl*, 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (finding insufficient allegation of conspiracy despite plaintiff's specific claims of conspiracy to alter tapes and create illegal search warrants, as there was no basis for the assertion that defendants actually conspired together to bring about these actions), *quoting Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993); *see also Hickey–McAllister v. British Airways*, 978 F.Supp. 133 (E.D.N.Y.1997) (holding that even though plaintiff alleged a conspiracy to present false testimony, she did not allege that defendants had any meeting of the minds), *citing San Filippo v. U.S. Trust Co. of NY*, 737 F.2d 246, 256 (2d Cir.1984). The *Hickey–McAllister* court found that mere allegations that defendants' actions were committed "in furtherance of a conspiracy" were not enough, as "plaintiff has alleged no facts at all from which a meeting of the minds between [defendants] on a course of action intended to deprive plaintiff of her constitutional rights can be inferred." 978 F.Supp. at 139.

Romer alleges that DA Defendants and DOCS Commissioner Goord and Recore conspired to violate his civil and constitutional rights through meetings, letters, e-mails, and other correspondence. This claim fails both the "violation of a right" and "conspiracy" requirements. Romer's failure to sufficiently allege violation of

cognizable constitutional rights makes conspiracy to violate those rights a legal impossibility. As discussed, Romer fails to allege deprivation of a constitutional right in his contentions regarding either defendants' denial of his work release applications or in their publication of information about his conviction, and he has set forth no other violation of a constitutional right underlying his claim.

Even assuming for the purpose of this motion that Romer passed the constitutional violation prerequisite, he still cannot satisfy the conspiracy prong because his claims are too general and conclusory to sufficiently plead the meeting of the minds requirement. *See Dwares,* 985 F.2d at 99–100 (2d Cir.1993) (finding that a § 1983 conspiracy claim must contain more than mere conclusory allegations); *Simms v. De Paolis,* No. 99 Civ. 2776, 2000 WL 1134564,* 5 (S.D.N.Y. Aug. 9, 2000) (same). Romer repeatedly alleges that Mauskopf's actions took place under direction of Morgenthau, and that DOCS Defendants' actions were carried out both at the "behest" and "urged and influenced" by DA Defendants. *See, e.g.,* Compl. ¶¶ 31, 41–42, 77. Romer's conspiracy allegations cannot be sustained as sufficiently specific merely by his stating the means by which defendants may have communicated with one another over the years of his incarceration. While Romer has cited defendants' furtherance of their alleged conspiracy through practically every conceivable means of communication, this recitation suggests nothing supporting an inference that any of this alleged communication was centered on, or led to a meeting of the minds among defendants about denying Romer a cognizable constitutional right. Absent allegations of facts leading to a reasonable inference that defendants conspirationally conferred with a purpose of actually depriving Romer of any recognized constitutional right, he cannot state a sustainable conspiracy claim.

Romer's conspiracy count is dismissible under either theory. But, on the basis of the above finding that Romer had failed to allege sufficiently the deprivation of a constitutional right, rendering impossible any recovery on such a claim, the Court dismisses the claim without leave to replead.

G. *Intentional Infliction of Emotional Distress*

██ Under the Prisoner Litigation Reform Act ("PLRA"), a confined prisoner claiming intentional infliction of emotional distress must have suffered actual physical injury as a result of defendants' actions; although the injury need not be significant it must be more than *de minimis.* 42 U.S.C. § 1997e(e); *see also Wright v. Miller,* 973 F.Supp. 390, 396 (S.D.N.Y.1997); *Geller,* 717 F.Supp. 213 (finding allegations of hypertension as presenting a factual issue as to whether a significant physical injury was alleged). New York State law requires intentional infliction of emotional distress for "extreme and outrageous conduct intentionally or recklessly caus[ing] severe emotional distress to another ... [The] conduct [must be] outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983).

██ Romer's intentional infliction of emotional distress claim, however, is brought, not under New York law, but as a violation of his federal due process rights. He neither alleges a violation of state law nor asks that the Court exercise supplemental jurisdiction, instead stating specifically that the charge is brought as a constitutional violation. This claim is untenable. While § 1983 is applicable to already-existing federal civil rights, it does not create new substantive rights, *see Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), or make a state tort actionable as a federal crime or constitutional deprivation just because it is committed by a state official.

*See Paul v. Davis,* 424 U.S. 693, 700, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (declaring that even if "a prisoner is assaulted, injured or even murdered by state officials[, it] does not necessarily mean that federal rights have been invaded"). Even assuming the proposition, which defendants contest, that an aggravation of a prisoner's hypertension can constitute sufficient physical injury, and that Romer's allegation that defendants' extreme and unjustified conduct caused him physical and emotional distress would suffice to plead a tort claim under state law, this Court concludes that such a claim is not actionable as a constitutional violation under § 1983. Accordingly, this claim is dismissed.

### H. *Equal Protection*

■ Romer also reads into his complaint an equal protection claim, which requires "intentional or purposeful discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). He asserts in his Memorandum of Law that the complaint states a claim for differential treatment inconsistent with his safety and welfare.[6] *See Dugar v. Coughlin,* 613 F.Supp. 849, 856–57 (S.D.N.Y.1985). Romer could state an equal protection claim as a "class of one" by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 1073, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). However, this Court believes that Judge Pauley's finding that only a due process violation is alleged in the complaint is both the law of the case and correct. The complaint mentions "equal protection" numerous times, but clearly states that the claim is for violation of Romer's due process rights under the Fourteenth Amendment. The complaint does not give adequate notice to the defendants or the Court that a separate equal protection cause of action is being asserted, and thus this claim must be dismissed.

Additionally, the Court notes that even if an equal protection argument could be reasonably inferred as a separate action from a fair reading of Romer's complaint, the allegations would be insufficient to state a valid claim. Defendants point out that to the extent Romer advances an equal protection theory, he asserts differential treatment in reference to only one specific inmate in federal, rather than state, custody. According to Romer, despite this federal inmate's having committed more serious crimes, he received a less severe sentence and was imprisoned under more accommodating conditions than Romer. Beyond this example, the complaint does not particularize in what specific ways and in relation to which similarly situated state inmates defendants allegedly treated Romer differently without a rational basis for the difference. The Court agrees that the one comparison Romer details does not form a sufficient basis justifying an equal protection claim. For this reason, Romer's equal protection violation theory also would be insufficient.

### ORDER

For the reasons set forth in the preceding decision, it is hereby

**ORDERED** defendants' motion to dismiss the complaint for failure to state a claim is granted, and it is further

**ORDERED,** that the clerk of the Court is directed to enter judgment dismissing the complaint herein with prejudice.

---

**6.** As the complaint does not set forth an equal protection claim as a separate cause of action, Judge Pauley ordered Romer's work release count to be read as asserting only a due process claim. *See* Scheduling Order of Judge William H. Pauley dated January 10, 2000, at 1. Nonetheless, in opposition to this motion Romer insists that his complaint is replete with references to his being treated differently by defendants in violation of his equal protection rights.